UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MATT ERARD,                                      Case No. 2:12-cv-13627
                                                 District Judge Stephen J. Murphy, III
         Plaintiff,                              Magistrate Judge Laurie J. Michelson

v.

MICHIGAN SECRETARY OF STATE RUTH JOHNSON
in her official capacity,

         Defendant.

_____/

**REPORT AND RECOMMENDATION TO DENY
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [12]**

"[T]he States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer v. Brown*, 415 U.S. 724, 730 (1974). This case involves a challenge to one such code. Plaintiff Matt Erard, the Secretary of the Socialist Party of Michigan and a Socialist-Party-nominated candidate for United States Congress, primarily challenges the constitutionality of Michigan Compiled Laws § 168.685(1). Under § 168.685(1), a candidate of a "new political party" will not be printed on Michigan's general election ballot unless the party timely produces "signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast" for governor at the last gubernatorial election. Mich. Comp. Laws § 168.685(1). The Socialist Party fell well short of obtaining the required 32,261 signatures by the July 19, 2012 deadline for the upcoming general election. Erard maintains that this was, at least in

part, because the requirement is both unconstitutionally burdensome and inequitable.

Before the Court for a Report and Recommendation is Plaintiff's Motion for Preliminary Injunction. (ECF No. 12.) Plaintiff did not file a proper motion until September 6, 2012. (*See* ECF No. 11, Order Striking Pl.'s 1st and 2d Mots. for Prelim. Inj.)[1] Given the preliminary relief Erard seeks — an order enjoining Defendant Michigan Secretary of State's ("Secretary") enforcement of § 168.685 which serves to bar Socialist Party candidates from the November 6, 2012 ballot — the Court set an expedited briefing schedule and held a preliminary injunction hearing on September 19, 2012. (*See* ECF No. 12, Report and Recommendation on Pl.'s Mot. for TRO.) For the reasons that follow, Plaintiff's Motion for Preliminary Injunction should be DENIED.

## I. BACKGROUND

Michigan provides three ways for a political party to place its candidates on the general-election ballot. First, a political party whose "principal candidate" received at least 5% of the "total vote cast for all candidates for the office of secretary of state in the last preceding state election" qualifies to appear on Michigan's primary ballot. *See* Mich. Comp. Laws § 168.532. Parties satisfying this five-percent threshold may place candidates on the general-election ballot through a direct primary. For the November 6, 2012 general election, the five-percent requirement equated to 158,633 votes. Michigan Secretary of State, *State of Michigan Political Party Status* (Oct. 27, 2011), http://www.michigan.gov/documents/sos/Pol_Party_Status_2011_5_352715_7.pdf. The Republican Party of Michigan and the Democratic Party of Michigan were the only two parties that have qualified for the general election ballot under this method. *See id.* at 1.

---

[1]The Court uses the word "proper" loosely; as filed, the format of Erard's motion does not comply with Eastern District of Michigan Local Rules, and is, even under this Court's grant of excess pages, significantly too long.

Second, a political party may qualify to nominate candidates for the general election by caucus or convention. To so qualify, the "principal candidate" of the political party must receive a vote equal to at least "1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected." Mich. Comp. Laws §§ 168.560a, 168.685(6). For the upcoming election, the one-percent requirement translated to 16,038 votes. *See State of Michigan Political Party Status* at 2. The following political parties met the requirement: Libertarian Party of Michigan, U.S. Taxpayers Party of Michigan, Green Party of Michigan, and Natural Law Party. *Id.*

When a political party, such as the Socialist Party, does not qualify to place candidates on the general election ballot via either primary or convention, the party must file a "new political party" petition. In particular, Michigan law provides:

> The name of a candidate of a new political party shall not be printed upon the official ballots of an election unless the chairperson and secretary of the state central committee of the party files with the secretary of state, not later than 4 p.m. of the one hundred-tenth day before the general November election, a certificate signed by the chairperson and secretary of the state central committee bearing the name of the party, *together with petitions bearing the signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast for all candidates for governor at the last election in which a governor was elected.* The petitions shall be signed by at least 100 registered electors in each of at least 1/2 of the congressional districts of the state. All signatures on the petitions shall be obtained not more than 180 days immediately before the date of filing.

Mich. Comp. Laws § 168.685(1) (emphasis added). For the November 6, 2012 general election, a "new political party" had the six months prior to July 19, 2012 to collect the 32,261 signatures necessary to place its candidates on the ballot. *See State of Michigan Political Party Status* at 3.

The Socialist Party of the United States of America was founded in 1901 and "is a national

3

political party." (Compl. ¶ 8.)  The Party "see[s] socialism as a new social and economic order in which workers and consumers control production and community residents control their neighborhoods, homes and school and the production of society is used for the benefit of all humanity, not the private profit of a few."   Socialist Party USA, What We Stand For, http://socialistparty-usa.net/ (last visited Sept. 18, 2012.)  Plaintiff Matt Erard is the Secretary of the Socialist Party of Michigan and the Socialist Party's nominee for Michigan's 13th Congressional District.  (Compl. ¶ 14.)  For the November 6, 2012 general election, the Socialist Party was able to obtain only 925 of the 32,261 petition signatures required for ballot-access under Mich. Comp. Laws § 168.685(1).  (ECF No. 24, Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. at 9.)  Accordingly, Socialist Party candidates, including Erard, are not presently slated to appear on Michigan's general election ballot.  Erard therefore seeks to enjoin the Secretary's enforcement of § 168.685(1).

## II.  PRELIMINARY INJUNCTION STANDARD

Plaintiff must carry a heavy burden to demonstrate entitlement to a preliminary injunction. Injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Layette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).  In determining whether to grant a preliminary injunction, a court considers the following four factors: (1) whether the plaintiff is likely to succeed on the merits, (2) whether the plaintiff is likely to suffer irreparable injury absent an injunction, (3) whether the balance of equities tips in the plaintiff's favor, and (4) whether the public interest would be served by granting the injunction.  *See  Winter*, 555 U.S. at 20.  It has been often said that the four preliminary injunction factors are "'factors to be balanced, not prerequisites that must be met.'"

4

*Michael v. Futhey*, No. 08-3932, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)). It remains, however, that the hallmark of injunctive relief is a likelihood of irreparable harm. *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("[T]he demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction."); *see also Winter*, 129 S.Ct. at 375 (rejecting the notion that a mere "possibility" of irreparable injury was sufficient for a preliminary injunction and holding that "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is *likely* in the absence of an injunction"). Additionally, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## III. ANALYSIS

Plaintiff primarily challenges Michigan's ballot-access requirement for "new political part[ies]": collecting petition "signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast" for governor at the last gubernatorial election. *See* Mich. Comp. Laws § 168.685(1). Erard says that the condition is invalid under three provisions of the U.S. Constitution and one provision of Michigan's governing text. First, he argues that the signature requirement impermissibly burdens his First Amendment rights to associate and vote. (ECF No. 12, Pl.'s Mot. for Prelim. Inj. at 5.) Erard next claims that § 168.685(1) violates the Equal Protection Clause in several ways, including, by placing higher demands for ballot appearance on new political parties than others. (*Id.* at 1-5; *see also id.* at 11-15, 29-33.) Third, Erard asserts that the signature requirement, by virtue of it being inequitable, violates the "Purity of Elections" Clause of the Michigan Constitution. (*Id.* at 9.) Fourth, Plaintiff claims that because § 168.685(1) runs afoul of

the Purity of Elections Clause, it also violates Article I, § 4 and Article II, § 1 of the Federal Constitution. (*Id.* at 10-11.) Plaintiff also argues that the Secretary has misapplied the vote-based qualification requirements set forth in Mich. Comp. Laws §§ 168.560a, 168.685(6), and, under a correct interpretation, the Socialist Party qualifies for ballot appearance under this alternate means. (*Id.* at 24-29.) The Court address these claims in turn.[2]

### A. Plaintiff's First Amendment Challenge to Mich. Comp. Laws § 168.685(1) Is Not Likely to Succeed

Michigan Compiled Laws § 168.685(1) potentially burdens two related First Amendment rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). While "both of these freedoms 'rank among our most precious freedoms,' each state necessarily has extensive authority to regulate elections which tends

---

[2]Plaintiff has raised additional challenges to Michigan's ballot-access scheme, including a challenge to the restriction on who may circulate petitions set forth in Mich. Comp. Laws § 168.544c. To the extent that theses challenges are intertwined with Plaintiff's challenge to § 168.685(1), the Court addresses them below. However, as will also be made clear below, not all of Plaintiff's claims, even if successful, would warrant injunctive relief. Such claims will not be fully explored at this time.

The Court also acknowledges the Secretary's collateral estoppel defense based on the Socialist Party's prior state-court challenge to Michigan's ballot-access scheme in which the Michigan Court of Appeals found no equal protection violation. *Socialist Party of Michigan v. Land*, No. 10-867-CZ (Ingham Cir. Ct. 2010), *aff'd*, No. 299951 (Mich. Ct. App. 2010), *leave denied*, 489 Mich. 896 (2011). Although the defense is potentially dispositive, the Court declines to analyze it at this time. The Secretary did not raise this defense until September 12, 2012, when the Court had already begun to analyze the merits of Plaintiff's claims. And even at that time, the Secretary did not provide the Court with information necessary to determine the viability of the defense. For instance, the Court did not have access to the state-court complaint which would have allowed the Court to determine what claims had previously been raised (and therefore possibly litigated). At the Court's request, this information was recently provided. To avoid further delay, however, the Court has addressed the merits of Plaintiff's claims. The Court's merits findings are only preliminary, and nothing precludes the Court from dismissing claims on collateral estoppel grounds in the future.

6

to restrict those rights to some degree." *Lawrence v. Blackwell*, 430 F.3d 368, 372 (6th Cir. 2005); *see also Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (finding that regulation of elections by restricting access to the ballot is constitutionally permissible); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (explaining that states "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder"). Thus, ballot-access requirements like § 168.685(1) do not automatically trigger strict scrutiny. The Supreme Court set forth the "appropriate analytical framework" in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006).

Under the *Anderson/Burdick* framework, this Court first looks "at the 'character and magnitude of the asserted injury' to petitioner's constitutional rights." *Libertarian Party of Ohio*, 462 F.3d at 585 (citing *Anderson*, 460 U.S. at 789). A "severe" restriction on First Amendment rights warrants heightened judicial scrutiny: "the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks and citation omitted). On the other hand, "if the state law imposes only 'reasonable, nondiscriminatory restrictions' upon the protected rights, then the interests of the state in regulating elections is 'generally sufficient to justify' the restrictions." *Libertarian Party of Ohio*, 462 F.3d at 586.

Precedent suggests that, in terms of signature quantity, Michigan's ballot-access requirement that a new political party obtain "signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast" for governor at the last gubernatorial election does not violate the First Amendment. *See Am. Party of Texas v. White*, 415 U.S. 767, 777 (1974) (concluding that Texas's requirement that a party "evidence support by persons numbering at least 1% of the total

vote cast for governor at the last preceding general election" was not unconstitutional); *Jenness v. Fortson*, 403 U.S. 431, 432 (1971) (concluding that Georgia's requirement that "a candidate . . . who does not enter and win a political party's primary election can have his name printed on the ballot at the general election only if he has filed a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question" was not unconstitutional); *Swanson v. Worley*, 490 F.3d 894, 897 (11th Cir. 2007) (concluding that Alabama's requirement that independent and minor party candidates produce "the signatures of at least three percent of the qualified electors who cast ballots for the office of Governor in the last general election for the state, county, city, district, or other political subdivision in which the political party seeks to qualify candidates for office" was not unconstitutional); *Rogers v. Corbett*, 468 F.3d 188, 191 (3d Cir. 2006) (concluding that Pennsylvania's requirement that minor political parties "place their candidates . . . on the general election ballot by nomination petitions . . . . [with] signatures . . . equal to 2% of the vote total of the candidate who obtained the highest number of votes for state-wide office in the previous election"); *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 254 (6th Cir. 1998) (concluding that Ohio's requirement that an independent candidate "file a nominating petition that contains valid signatures of at least one percent of qualified electors voting in the last gubernatorial election who reside within the district, political subdivision or portion thereof where the election is to be held" was not unconstitutional); *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 793-94 (11th Cir. 1983) (concluding that Florida's requirement that "a minor political party may have the names of its candidates for statewide office printed on the general election ballot if a petition . . . is signed by 3% of the state's registered voters" was not unconstitutional).

The First Amendment analysis, however, is not so simple: "It is this combined burden on the

party's rights that [a Court] must address." *Libertarian Party of Ohio*, 462 F.3d at 592-93 (noting that analyzing "the burdens imposed by the challenged [ballot-access] statutes separately, rather than addressing their collective impact," would constitute error); *see also McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1223 (4th Cir. 1995) ("Because it is rare indeed that a rule which requires a party to demonstrate a particular percentage of support in order to secure or retain ballot access would be unconstitutional *per se*, a reviewing court must determine whether 'the totality of the [state's] restrictive laws taken as a whole imposes a[n unconstitutional] burden on voting and associational rights.'" (quoting *Williams v. Rhodes*, 393 U.S. 23, 34 (1968))). Mindful that ballot-access burdens must be considered in aggregate, courts have considered the following factors: (1) whether voters may sign the petition regardless of party affiliation; (2) whether voters who already voted in the primary may sign the petition; (3) whether voters may sign more than one petition; (4) whether Michigan places geographic caps on the number of signatures that can be gathered from one area; (5) whether Michigan limits the maximum number of signatures that may be submitted for verification; (6) whether a minor party has sufficient time to conduct the petitioning effort; and (7) whether Michigan requires impermissibly burdensome expenses. *Swanson*, 490 F.3d at 904 n.11. Additionally, in this case, the following demands on ballot-access are also relevant: (8) Michigan's requirement that new-party petitions contain a printed warning to potential signers that they may sign only one such petition; (9) Michigan's deadline for submitting petition signatures, (10) Michigan's requirement that petition circulators be registered to vote in Michigan, and (11) the history of minor-party appearance on Michigan's election ballots.

*1. Factors Increasing The Burden on New Political Parties To Gain Ballot Access*

On the present record, the Court finds that five of the above factors at most marginally increase the burden of the signature collection requirement set forth in § 168.685(1). First, it is true that, because new-party petitions are due prior to Michigan's primary elections, it is impossible for primary voters to subsequently sign a new-party petition.[3] But the Supreme Court has suggested that holding primary voters to their selection does not impose a significant disadvantage to a signature-collecting minor party: "Electors may vote in only one party primary; and it is not apparent to us why the new or smaller party seeking voter support should be entitled to get signatures of those who have already voted in another nominating primary and have already demonstrated their preference for other candidates for the same office the petitioning party seeks to fill." *See Am. Party of Texas v. White*, 415 U.S. 767, 785 (1974). The Court therefore finds that the inability of primary voters to subsequently sign a new-party petition only makes it marginally more difficult for a new political party to gain ballot access.

Michigan's petition submission deadline is also only slightly burdensome. Courts have found that early deadlines, both in terms of the election cycle and as compared to major parties' primary elections, may impose an unconstitutional burden on ballot access. *See e.g.*, *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 590 (6th Cir. 2006). This is because "[d]eadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized. . . . Early

---

[3]Michigan's deadline for the submission of signatures is 110 days in advance of the November election but Michigan's primaries are held later, "on the Tuesday after the first Monday in August," Mich. Comp. Laws § 168.543. This year, the two dates were July 19, 2012 and August 7, 2012, respectively.

10

deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party." *Id.* at 586. Michigan's deadline for submitting petition signatures is 110 days in advance of the November general election, i.e., mid-to-late July. *See* Mich. Comp. Laws § 168.685(1). This is about three-weeks before Michigan's primaries. The difference compares favorably to those found to be impermissibly early. *See Libertarian Party of Ohio*, 462 F.3d at 590-91 (citing cases finding petition submission deadlines two to four months in advance of primary to be unconstitutional and holding that Ohio's deadline of 120 days pre-primary (364 days pre-election) imposed a "severe" burden on First Amendment rights). Further, primary candidates in Michigan must file their nominating petitions on "the twelfth Tuesday before [Michigan's] August primar[ies]." Mich. Comp. Laws § 168.551. This is well before new-party petitions are due. *Cf. Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (finding relevant to the "severe" burden inquiry that "those running in [an Ohio] primary must file sixty days before the primary, campaign, and win their party's primary while independent candidates must spend the time before the primary acquiring the requisite number of signatures and then file their petition by the day before the primary"). Accordingly, the Court finds that Michigan's 110-day deadline for new political parties to submit collected signatures imposes only a slight burden on ballot access.

Michigan's cap on the number of signatures that can be gathered from one geographic area — 100 from each of half of Michigan's 15 congressional districts, Mich. Comp. Laws § 168.685(1) — also imposes at most a slight burden on ballot access. Because the caps are small, a minor political party can obtain all but about 700 of its signatures from a single populated district or the districts that the party has the most support. *Cf. Moore v. Ogilvie*, 394 U.S. 814, 815 (1969)

(striking Illinois petition requirement of "200 qualified voters from each of at least 50 counties" because the law discriminated "against the residents of the populous counties of the State in favor of rural sections"); *Socialist Workers Party v. Hare*, 304 F. Supp. 534, 535 (E.D. Mich. 1969) (striking former requirement of Mich. Comp. Laws § 168.685 that a new political party produce signatures equal to one-percent of registered voters and that "the petitions shall be signed by at least 100 residents in each of at least 10 counties of the state *and not more than 35% of the minimum required number of the signatures may be by resident electors of any one county*" (emphasis added)).

Michigan's prohibition on signing more than one new political-party petition, *see* Mich. Comp. Laws § 168.685(8), also only marginally increases the burden on a new political party attempting to gain ballot access. It is conceivable that, early in an election cycle at least, an individual may have interest in, or wish to support, more than one new political party. However, the adverse impact of § 168.685(8) on ballot-access is tempered by another provision of Michigan's election code. Since 2002, a political party may qualify to appear on Michigan's general election ballot without resorting to collecting signatures if any candidate of the political party received at least "1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected." Mich. Comp. Laws §168.560a; *see also id.* § 168.685(6). Erard himself asserts that, in each of the five most recent general elections (2002, 2004, 2006, 2008, and 2010) "all . . . qualified parties that continued to nominate candidates . . . have successfully retained their automatic ballot access into each subsequent election . . . ." (ECF No. 1, Compl. ¶ 22.) In fact, four minor parties met the vote-based requalification requirement for the upcoming election. *State of Michigan Political Party Status* at 1. The

significant number of minor political parties requalifying for ballot appearance under §168.560a necessarily reduces competition among "new" political parties for petition signatures.  In fact, for the upcoming general election, only three minor political parties attempted to gain ballot access by collecting signatures: the Americans Elect Party, the Anti-NAFTA Party, and the Socialist Party.  *See State of Michigan Political Party Status* at 3; (Compl. at 11 n.32).  Accordingly, on the present record, the Court finds that Michigan's sign-for-only-one-new-party restriction in § 168.685(8) increases the burden of collecting the required number of signatures only slightly.

Relatedly, Plaintiff asserts that Michigan's election code unconstitutionally requires that new-party petitions include a warning to potential signers that they may not sign more than one new-party petition.  (Pl.'s Mot. for Prelim. Inj. at 15-18.)  In particular, new-party petition forms must state, in 12-point, boldface font:

> Warning: A person who knowingly signs petitions to organize more than 1 new state political party, signs a petition to organize a new state political party more than once, or signs a name other than his or her own is violating the provisions of the Michigan election law.

Mich. Comp. Laws §§ 168.685(3), (4).  In *Anderson v. Mills*, the Sixth Circuit explained,

> Although the US Constitution does not specifically guarantee that a person has a right to a secret ballot, such a right has been recognized as one of the fundamental civil liberties of our democracy. . . .  This principle takes on such significance because it safeguards the purity of our election process by eliminating the fear of scorn and ridicule, as well as lessening the evils of violence, intimidation, bribery and other corrupt practices which can be incumbent in non-secret elections.

664 F.2d 600, 608 (6th Cir. 1981).  Plaintiff relies on *Anderson* and similar cases to argue that, because of Michigan's warning language, those who sign a new-party petition are forced to publically associate with that party.  (*See* Pl.'s Mot. for Prelim. Inj. at 17.)  According to Plaintiff,

13

because some potential signers may not be willing to relinquish their "right to anonymity as to their partisan association," signature collection becomes more difficult.  (*Id.*)  Erard also attacks the warning language as impermissibly vague.  (*Id.*)  He further claims that the required public commitment to a new political party is inequitable because voters in Michigan's primaries are not required to register with a particular political party.  (*Id.* at 15.)

As an initial matter, a declaration that Michigan's warning requirement is unconstitutional would not remedy imminent, irreparable harm.  The injunction would only prevent the Secretary from requiring the warning language on *future* petitions circulated by Erard or Socialist Party supporters.  Accordingly, the Court does not now address the separate constitutionality of Mich. Comp. Laws §§ 168.685(3), (4).

As to the effect the warning language has on collecting the signatures required by § 168.685(1), as with the other factors discussed so far, Plaintiff has not persuaded the Court that the burden on ballot access is anything but marginal.  Indeed, Plaintiff has not identified any potential signer who refused because of the warning language.   And even absent the warning language, a petition signature implicitly states that the signer wants the new political party to appear on the ballot.  But this implicit declaration is inherent in every signature-collection scheme and therefore cannot be divorced from the collection requirement itself.  So the question is how much more Michigan's warning language makes the signer publically declare.  The answer is not much. It is true that, because of the warning language, a signer is forced to publically declare that she has not signed any other new-party petitions; in turn, the signer implicitly declares, that, among new political parties attempting to gain ballot access, she prefers the party she signed for.  But this is quite different from stating that, among new political parties, she only supports that party.  And it

is far short of declaring an intent or desire to vote or nominate that party's candidates. *Cf. Anderson v. Mills*, 664 F.2d 600, 608 (6th Cir. 1981) (finding unconstitutional Kentucky's requirement that signers of a candidate petition declare that they "desire, and are legally qualified, to vote for the candidate"); *Libertarian Party of S. Dakota v. Kundert*, 579 F. Supp. 735, 737, 739 (D.S.D. 1984) (finding unconstitutional petition language that had the effect of forcing a signer to declare an intention to register as a member of the new party). Given that Michigan's warning language is distinguishable from that found impermissible in Plaintiff's cases, and that Plaintiff has put forth no evidence that the warning language in fact has the chilling effect that he believes it does, the Court finds that any "chilling" effect imposes at most a slight burden on a new political party's signature collection efforts. *See McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1227 (4th Cir. 1995) (holding that petition language requiring the signer to declare an "inten[t] to organize a new political party to participate in the next succeeding general election" was amenable to an interpretation that was "not likely to deter a person otherwise interested in supporting a petitioning party from contributing her signature" and concluding that "we may not declare a state's mandatory ballot petition language unconstitutional merely because it could conceivably mislead some individuals and could have been crafted more adroitly"). Accordingly, on the present record, the Court finds that Michigan's warning language, like the four other factors already discussed, increases the signature-collecting burden on a new political party only slightly.

A sixth factor imposes a more significant burden. Michigan restricts those who may circulate new-party petitions to individuals registered to vote in Michigan. *See* Mich. Comp. Laws § 168.544c(3) ("At the time of circulation, the circulator of a petition shall be a registered elector of this state."). The Court is troubled by the fact that similar registration or residency requirements

on petition circulators have been held unconstitutional. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 194 (1999) (finding Colorado's requirement that initiative-petition circulators be registered to vote in Colorado imposed a severe burden on the speech rights of individuals involved with the initiative process because it significantly decreased the pool of potential circulators); *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008) (finding that Arizona's residency requirement for candidate-petition circulators warranted strict scrutiny and holding that requirement was not narrowly tailored to the compelling interest in preventing election fraud); *Nader v. Blackwell*, 545 F.3d 459, 473 (6th Cir. 2008) (holding that Ohio's requirement that candidate-petition circulators must be Ohio residents and registered to vote in Ohio violated the First Amendment rights of independent presidential candidate); *Bogaert v. Land*, 675 F. Supp. 2d 742, 749 (W.D. Mich. 2009) (finding Michigan's requirement that petition circulators be "'a qualified and registered elector in the electoral district of the [public] official sought to be recalled'" violated the First Amendment). Although, for present purposes, the Court need not decide whether § 168.544c(3) is on its own unconstitutional,[4] the Court does find that the requirement more than marginally increases the signature-collection burden of § 168.685(1).

---

[4]As with Plaintiff's independent challenge to Michigan's requirement that petitions include a warning about singing more than one new-party petition, a declaration that Michigan unconstitutionally restricts who may circulate petitions would not remedy imminent, irreparable harm. If the Court enjoins the Secretary from enforcing § 168.544c(3), the Socialist Party would not obtain access to the November 2012 general election ballot — the injunction would only prevent the Secretary from precluding Erard or the Socialist Party from *now* enlisting out-of-state or unregistered petition circulators.

16

   2.  *Factors Alleviating The Burden on New Political Parties To Gain Ballot Access*

While one factor seems to support Plaintiff's claim that § 168.685(1) works a severe burden on First Amendment rights and five lend additional marginal support, the remaining five factors alleviate the burden on a new political party attempting to collect petition signatures.  First, it appears that Michigan allows a voter to sign a new-party petition regardless of the individual's party affiliation.  *See* Mich. Comp. Laws § 168.685(8).  Second, Michigan does not cap the number of signatures that may be submitted for verification; a new political party may obtain signatures in excess of the one-percent requirement and thereby reduce its chances of falling short of the threshold when signatures are invalidated during the Secretary's petition-review process.  Third, the case law indicates that Michigan's 180-day window to collect signatures is more than ample time.  *See Am. Party of Texas v. White*, 415 U.S. 767, 786 (1974) ("Neither do we consider that the 55 days is an unduly short time for circulating supplemental petitions.  Given that time span, signatures would have to be obtained only at the rate of 400 per day to secure the entire 22,000, or four signatures per day for each 100 canvassers — only two each per day if half the 22,000 were obtained [by turnout at the party's convention on primary day]."); *Libertarian Party of Florida v. State of Fla.*, 710 F.2d 790, 794 (11th Cir. 1983) ("Under the Florida statute, the Party had . . . 188 days, to conduct its petitioning effort.  The time given to gather signatures compares favorably to those previously found permissible.").  Fourth, Michigan does not impose burdensome expenses (e.g., a per-signature validation cost) upon a new party attempting to gain ballot access.

Fifth, and perhaps most significant, is that minor political parties have a history of gaining access to Michigan's ballots.  *See Am. Party*, 415 U.S. at 787 (finding burden akin to obtaining 22,000 petition signatures was not too onerous "especially where two of the original party plaintiffs

17

themselves satisfied these requirements"); *Libertarian Party of Ohio*, 462 F.3d at 589-90 ("While not conclusive in and of itself, the Supreme Court has noted that a historical record of parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality."); *Council of Alt. Political Parties v. Hooks*, 179 F.3d 64, 77 (3d Cir. 1999) ("That New Jersey's statutory requirements impose only a minimal burden is made clear when one considers the plethora of candidates who qualified for the general election ballot under the former statutory scheme, which imposed an earlier filing deadline than the one at issue here."). Plaintiff provides that, with the exception of the 1978 general election, "[a]t least one new political party qualified for the Michigan ballot in every general election held between the original enactment of 1954 P.A. 399 and the general election of 2000." (Compl. ¶ 20.)  And the Secretary provides an unrebutted history of one or two minor political parties timely obtaining signatures of at least "1% of the total number of votes cast for all candidates for governor at the last [gubernatorial] election" since 1990:

> 1990: Workers World Party;
>
> 1992: Workers League Party and Natural Law Party;
>
> 1994: Libertarian Party and Natural Law Party;
>
> 1996: Socialist Equality Party and Reform Party;
>
> 1998: Natural Law Party;
>
> 2000: U.S. Taxpayers Party and Green Party;
>
> 2002: Libertarian Party;
>
> 2010: Tea Party

(*See* ECF No. 24, Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. at 9.)  Based on Plaintiff's Complaint,

it also appears that the Americans Elect Party satisfied the signature requirement for the upcoming general election but subsequently chose not to nominate a candidate. (Compl. at 11 n.32.)

At oral argument, Plaintiff discounted the significance of these minor political parties' compliance with § 168.685(1). For example, Erard explained that the American Elect Party is not a partisan entity and could not, under its bylaws, nominate any candidate for office other than for the office of the President of the United States. He explained that the Libertarian Party qualified only through the use of hundreds of volunteers coupled with $30,000 in petition circulation expenditures. He further opined that the U.S. Taxpayers Party needed a $50,000 loan. The Court acknowledges these qualifications but they do not significantly undermine the fact that minor parties are able to comply with § 168.685(1).

Plaintiff also urges the Court to discount the historical success of minor parties in satisfying the petition signature requirement of § 168.685(1) by emphasizing recent history: for the 2004, 2006, and 2008 general elections, no new political party met the standard, and, for the 2002, 2010, and 2012 general elections, only one party satisfied the requirement. (Compl. ¶ 20; ECF No. 23, Pl.'s Stmt. of Facts in Support of Mot. for Prelim. Inj. at 3.) But there is a ready explanation for the drop-off: in 2002, Michigan made it easier for minor political parties to requalify for ballot appearance. Prior to 2002, § 168.685(6) defined "principal candidate" as "the candidate whose name appears nearest the top of the party column" on the ballot. Mich. Comp. Laws § 168.685(6) (West 1989). In 2002, the Michigan legislature redefined "principal candidate" as the candidate "who receives the greatest number of votes of all candidates of that political party for that election." *See* Mich. H.B. 4237, 2002 Mich. Legis. Serv. P.A. 399; Mich. Comp. Laws Ann. § 168.685(6) (West 2005). Thus, a political party may now requalify for ballot appearance if *any* of its candidates received at

19

least "1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected." Mich. Comp. Laws § 168.560a; *see also id.* § 168.685(6). Erard himself provides that the change had the following positive effect on minor-party requalification:

> Not only has every ballot-qualified minor party's 'principal' (i.e., highest vote-totaling) candidate widely surpassed the minimum vote threshold needed to ensure his or her party's continued ballot access retention [in] each of the five general elections held since the enactment of 2002 P.A. 399, but every minor party has also similarly obtained vote totals widely exceeding this . . . threshold for each and every candidate whom it has fielded for any of the eight statewide educational board seats, appearing on every Michigan general election ballot, throughout each of the five State general elections held since [the enactment].

(Compl. ¶ 37.) Accordingly, the decrease in minor parties satisfying the signature requirement of § 168.685(1) since 2002 speaks little to the burden that requirement imposes on ballot access: there are now simply less minor political parties attempting to qualify via the petition route. Indeed, for the upcoming election, four minor political parties will appear on the ballot by way of vote-based requalification under § 168.560a. *State of Michigan Political Party Status* at 2-3.

### 3. Balancing of Factors and Aggregate Analysis of Michigan's Ballot-Access Scheme

In sum, on this record, only the limitation that petition circulators be Michigan registered voters appears to impose a significant burden on ballot-access. Aside from that restriction, the remaining considerations do not make the one-percent signature collection requirement of § 168.685(1) significantly more onerous than when considering the provision's threshold in isolation: several factors marginally increase the burden on ballot access while others alleviate that burden. As such, Michigan's ballot-access requirements for new political parties compare favorably with requirements that the Supreme Court has upheld against constitutional challenges.

20

In *Jenness v. Fortson*, 403 U.S. 431 (1971), the Georgia statute under scrutiny required a candidate (who did not win a party primary) to file a petition with the signatures of *five* percent of all *registered voters*.  403 U.S. at 432.  Michigan much less onerously requires only *one* percent of those who *actually voted for governor* in the prior election.  Georgia's statute, like Michigan's, gave candidates 180 days to circulate signature petitions.  *Id.* at 433.  Georgia required the petition to be submitted in June; this too is comparable to Michigan's July deadline.  *Id.* at 433-34.  Georgia's petition deadline coincided with the deadline for appearance on the primary ballot.  *Id.*  Similarly, major-party candidates in Michigan must file their nominating petitions before the petition deadline. It is true that the ballot-access scheme considered in *Jenness* allowed voters to sign more than one petition and did not preclude those who voted in a primary from signing a petition.  *Id.* at 438-39. But the Court has already explained that Michigan's restrictions in this regard are not significant burdens.  Further, to the extent that minor aspects of the ballot-access scheme considered in *Jenness* are less onerous than Michigan's, Georgia's alleviating factors must be discounted in view of its considerably higher demand for signatures.  *Jenness* therefore strongly suggests that § 168.685(1) does not severely burden Plaintiff's First Amendment rights.

Plaintiff attempts to draw an analogy between Michigan's ballot-access requirements and those in Tennessee that have been recently-enjoined.  *Green Party of Tennessee v. Hargett*, No. 3:11-0692, 2012 WL 379774 (M.D. Tenn. Feb. 3, 2012).  The similarities, however, are not strong. First, Tennessee's signature-quantity requirement is significantly higher than Michigan's: "2.5% of the votes in the last gubernatorial election that undisputedly translates to 40,039 valid signatures of registered voters."  *Id.* at *41.  Second, Tennessee's ballot access history demonstrates that minor parties are less successful there than in Michigan.  *Id.* at *4-5 ("Since 1972, minor political parties

attempted to qualify as statewide political parties in Tennessee without success. . . . Since the 2000 general election, Tennessee and Oklahoma are the only states in which only the Democratic and Republican parties have appeared on the election ballots."). Third, although the *Hargett* court found that Tennessee's 2.5% requirement was unconstitutional apart from its petition submission deadline, it is notable that Tennessee requires that petitions be submitted 119 days in advance of its primary elections and seven months before the general election. *Id.* at *49. As noted, Michigan's deadline is only 110 days (less than four months) before the general election and only about three weeks before its primaries.

### 4. Conclusion on First Amendment Challenge

On the present record, Plaintiff has not shown that Mich. Comp. Laws § 168.685(1) imposes a "severe" burden on new political parties in their attempt to gain ballot access. Strict scrutiny is therefore not warranted. *See Libertarian Party of Ohio*, 462 F.3d at 586. And under this Court's less searching review, an important state interest sufficiently justifies Michigan's signature threshold: "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot-the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *accord Swanson v. Worley*, 490 F.3d 894, 911 (11th Cir. 2007) ("This Court previously has recognized that signature requirements promote the important state interest of ensuring that only bona fide independent candidates with a measure of support gain ballot access, preventing frivolous candidates from clogging the ballot and confusing voters."). Accordingly, Plaintiff is not likely to demonstrate that Mich. Comp. Laws § 168.685(1) violates his First Amendment right to associate for the

22

advancement of political beliefs or to cast his vote effectively.

### B.  Plaintiff's Equal Protection Clause Challenges to Mich. Comp. Laws § 168.685(1) Are Not Likely to Succeed

The Court more expeditiously addresses Plaintiff's claims that § 168.685(1) violates the Equal Protection Clause.  Erard first asserts that Michigan's ballot-access scheme is constitutionally inequitable because political parties may requalify for the ballot more easily than initially qualifying.  To requalify under § 168.560a, a political party's "principal candidate" must obtain "1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected."  *See also* Mich. Comp. Laws § 168.685(6).  In contrast, § 168.685(1) demands "signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast" for governor at the last gubernatorial election.  For the upcoming general election, § 168.560a's requirement translated to 16,038 votes while § 168.685(1) required 32,261 petition signatures.  Erard says that the Secretary "has no rational basis for requiring more than twice [the] level of support from 'new' political parties seeking ballot access."  (Pl.'s Mot. for Prelim. Inj. at 5.)

The Secretary has not violated the Equal Protection Clause by providing different methods for ballot requalification and initial appearance.  Since 1988, every party that did not requalify under § 168.560a accessed the ballot through the present petition signature requirement.  For example, each of the four minor political parties who will appear on the November 2012 ballot via § 168.560a at one time satisfied the signature requirement of § 168.685(1).  *See Performance of Minor Parties in Michigan General Elections* at 2.  It is only because they met the petition signature demands of § 168.685(1) that they are now able to reappear on Michigan's ballots through arguably less-demanding means.  Nothing in Michigan's election codes is inherently inequitable to Erard or the

23

Socialist Party: should they meet the demands of § 168.685(1), they too will be eligible to requalify via § 168.560a in subsequent elections.[5]

Plaintiff asserts that Michigan's two-track scheme for requalification and initial appearance is comparable to the Ohio scheme struck down as unconstitutional in *Williams v. Rhodes*, 393 U.S. 23, 25 (1968).  (Pl.'s Mot. for Prelim. Inj. at 2.)  It is true that new political parties in Ohio had to obtain petition signatures "totaling 15% of the number of ballots cast in the last preceding gubernatorial election" whereas the Democratic and Republican parties were "allowed to retain their positions on the ballot simply by obtaining 10% of the votes in the last gubernatorial election."  *Id.* at 24-26.  And it is also true that the Supreme Court concluded that heightened judicial scrutiny of Ohio's two-track scheme was proper under the Equal Protection Clause.  *Id.* at 31.  Critically, however, new political parties in Ohio were burdened in additional ways beyond having to obtain one-third more signatures than the major parties did votes.  For instance, the Ohio scheme required new political parties to file their petitions nine months before the election and three months before primary elections; it also imposed burdensome organizational procedures, including a requirement that new parties hold a primary election.  *Id.* at 25 n.1, 26, 29 n.7, 35-37.  This is to say nothing about Ohio's then-existing 15% requirement equating to over 425,000 signatures.  *Id.* at 36.  The Court held that these provisions, "taken as a whole," were invidiously discriminatory and made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties."  *Id.* at 25, 34.  Michigan's requalification and initial qualification tracks for ballot access are not nearly so disparate.  Further, given that several different minor political parties have met

---

[5]Nor does Plaintiff provide any compelling explanation to support his contention that he could gather 16,038 petition signatures but not 32,261.

§ 168.685(1)'s signature requirement, Plaintiff has not shown that it is "virtually impossible" for a minor political party to gain access to Michigan's ballots.

Erard next claims that requalification has become even easier since 2002 when, as discussed, the term "principal candidate" in Mich. Comp. Laws § 168.685(6) was redefined.  Plaintiff is probably correct.  But this does not change the fact that, since 1988, every minor political party benefitting from this reduced burden first satisfied the petition signature requirement presently set forth in § 168.685(1).  A different analysis would present itself if the presently requalifying minor parties gained ballot appearance under a one-percent signature collection requirement and then Michigan amended its election code to insulate these parties by, for example, relaxing requalification demands *and* increasing the burden on new parties to initially qualify by imposing a two-percent signature requirement.  This, however, is not how Michigan's ballot-access scheme evolved.  The petition signature requirement has remained unchanged since 1988.  *See* Mich. Comp. Laws. Ann. § 168.685(1) (West 1989).

Plaintiff next claims that the Secretary violated the Equal Protection Clause by retroactively applying the less onerous, post-2002 "principal candidate" standard to the 2000 vote totals of the U.S. Taxpayers Party and the Natural Law Party's candidates but did not do so for the Socialist Party.  (Pl.'s Mot. for Prelim. Inj. at 29-33.)  According to Plaintiff, in 2000, the U.S. Taxpayers Party and the Natural Law Party had *a* candidate who met the one-percent vote threshold set forth in § 168.560a but it was not *the* candidate, as the pre-2002 amendment language required, who was listed "nearest the top of the party column."  Yet, Plaintiff asserts, the Secretary retroactively applied the post-2002 "all candidates" standard to allow those parties to requalify under § 168.560a.  Plaintiff's assertion that it was constitutionally unfair of the Secretary to not to do the same for the

25

Socialist Party is, in essence, a class-of-one Equal Protection Clause claim. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011).

Erard's class-of-one theory fails because he has not shown that the Socialist Party was similarly situated in all material respects to the U.S. Taxpayers Party and the Natural Law Party. *See Rondigo*, 641 F.3d at 682.  Erard implies that the Socialist Party, like the U.S. Taxpayers Party and the Natural Law Party in 2000, had a candidate who surpassed the vote threshold set in § 168.560a.  (Pl.'s Mot. for Prelim. Inj. at 29.)  What Plaintiff glosses over, however, is that the Socialist Party (under a different name) last appeared on the ballot in the 1976 general election, and it was at that election that it had a candidate who exceeded the one-percent requirement of § 168.560a.  (Compl. ¶¶ 50-55; *see also* Pl.'s Mot. for Prelim. Inj. at 29-30 n.75, 31 n.84.)  There is nothing irrational about the Secretary's retroactive application of a 2002 amendment to include vote totals from the immediate preceding election but declining to do the same for an election held 24 years earlier.

Finally, Plaintiff asserts that § 168.685(1) unconstitutionally discriminates on the basis of wealth.  Plaintiff asserts that "Michigan's statutory scheme, as presently applied, forecloses *any* minor party's potential satisfaction of its requirements through an exclusive, or even substantially-based, reliance on volunteer circulators."  (Pl.'s Mot. for Prelim. Inj. at 14.)  Erard further explains that the Socialist Party "aims to represent voters of limited economic means, so the exclusionary impact of high costs to secure ballot access is especially severe on Plaintiff's party specifically."  (*Id.* at 15.)

Plaintiff has not alleged that the facially-neutral signature requirement of § 168.685(1) was motivated by any discriminatory intent.  Plaintiff's disparate impact claim arguably fails for this

reason alone. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 207 (2008) (Scalia, J.,

concurring) ("A voter complaining about [a nondiscriminatory voting] law's effect on him has no

valid equal-protection claim because, without proof of discriminatory intent, a generally applicable

law with disparate impact is not unconstitutional." (citing *Washington v. Davis*, 426 U.S. 229, 248

(1976))); *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1355 (4th Cir. 1989) ("To establish

an equal protection violation, a plaintiff must show discriminatory intent as well as disparate

effect.").

Alternatively, the Court finds that rational basis review applies to Plaintiff's wealth-based

Equal Protection Clause claim.  It is true that "ordinarily, the strict scrutiny test is applicable under

the Equal Protection Clause to classifications affecting the exercise of fundamental rights." *Fulani

v. Krivanek*, 973 F.2d 1539, 1542 (11th Cir. 1992) (internal quotation marks omitted).  And while

the Supreme Court has not found a fundamental right to candidacy, *Bullock v. Carter*, 405 U.S. 134,

143 (1972); *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 659 (6th Cir. 2008), "the

rights of voters and the rights of candidates do not lend themselves to neat separation; laws that

affect candidates always have at least some theoretical, correlative effect on voters," *Bullock*, 405

U.S. at 143.  To the extent that § 168.685(1) burdens the fundamental right to vote, however, the

Court has already determined, in the context of Plaintiff's First Amendment challenge, that the

burden is not severe.  A different conclusion is not warranted here.  Indeed, in analyzing Equal

Protection Clause challenges to state ballot-access schemes, courts have applied the

*Anderson*/*Burdick* framework used to analyze First Amendment claims. *See Belitskus v. Pizzingrilli*,

343 F.3d 632, 643 (3d Cir. 2003) (analyzing equal protection challenge to ballot access law

requiring candidates to pay a filing fee to have their names placed on the general election ballot

under the *Anderson*/*Burdick* framework); *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992) (concluding, that while Supreme Court precedent was not entirely clear, "In this circuit . . . equal protection challenges to state ballot-access laws are considered under the *Anderson* test.").

As a point of contrast, *Bullock* is instructive.  There, the Supreme Court applied strict scrutiny to Texas's requirement that candidates pay a filing fee to appear on the primary election ballot.  405 U.S. at 144.  The law required candidates to raise as much as $8,900 from their constituents.  *Id.* at 145.  In considering the impact of the fee on voters, the Court reasoned:

> [T]he effect of this exclusionary mechanism on voters is neither incidental nor remote.  Not only are voters substantially limited in their choice of candidates, but also there is the obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required by the Texas system.  To the extent that the system requires candidates to rely on contributions from voters in order to pay the assessments, a phenomenon that can hardly be rare in light of the size of the fees, it tends to deny some voters the opportunity to vote for a candidate of their choosing; at the same time it gives the affluent the power to place on the ballot their own names or the names of persons they favor.

*Id.* at 144.  Because Texas's filing-fee scheme had "a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate" the Supreme Court applied strict scrutiny.  *Id.*

Unlike the scheme that warranted strict scrutiny in *Bullock*, Mich. Comp. Laws § 168.685(1) imposes a much more attenuated financial burden on voters.  Under § 168.685(1), voters contribute to their desired political party's ballot appearance with their signature — not their dollar.  Moreover, voters for a minor political party can also help by circulating petitions.  *See Am. Party of Texas*, 415 U.S. at 787 ("Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization.").  It may be true, especially where a party lacks strong support in Michigan, that

28

acquiring the requisite 32,261 signatures would be significantly aided by hiring petition circulation firms.  But Plaintiff has not put forth sufficient evidence to show that such firms are always necessary to comply with § 168.685(1).  In contrast, the fee in *Bullock* was entirely unavoidable. 405 U.S. at 137 ("Under the Texas statute, payment of the filing fee is an absolute prerequisite to a candidate's participation in a primary election.").  In fact, part of the reason the Texas fee was so onerous was because petitioning was not an alternative means of gaining ballot access: "There [was] no alternative procedure by which a potential candidate who is unable to pay the fee can get on the primary ballot by way of petitioning voters." *Id.*  Plaintiff's wealth-based equal protection challenge is therefore one or two steps removed from that in *Bullock*.

In short, Plaintiff's wealth-based disparate impact challenge to Michigan's petition signature requirement at most warrants rational basis review.  For reasons already stated, Michigan has an important interest satisfying this less-exacting standard.  Accordingly, as with Plaintiff's other Equal Protection Clause claims, Erard has not shown that § 168.685(1) likely unconstitutionally discriminates against the Socialist Party.

### C.   Plaintiff's "Purity of Elections" Clause Challenge to Mich. Comp. Laws § 168.685(1) Is Not Likely to Succeed

The "Purity of Elections" Clause of the Michigan Constitution provides,

> The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.

Mich. Const. 1963, art. 2, § 4.  This provision has been interpreted by the Michigan Supreme Court to "unmistakably require[] . . . fairness and evenhandedness in the election laws of [Michigan]." *Socialist Workers Party v. Sec'y of State*, 412 Mich. 571, 598 (1982).

29

Plaintiff's Purity of Elections Clause argument echos his Federal Equal Protection Clause claim.  He again asserts that requalification under § 168.560a is less onerous than initial qualification under § 168.685(1), and, therefore, Michigan's ballot-access scheme is unfair to new political parties.  (Pl.'s Mot. Prelim. Inj. at 8.)  But, as already stated, Michigan's ballot-access scheme does not convey any unfair advantage to any particular political party: parties benefitting from requalification under § 168.560a must have, at one time, earned the benefit by satisfying the signature requirement of § 168.685(1).

Plaintiff also analogizes the disparity between requalification under § 168.560a and initial qualification under § 168.685(1) with the disparity in the ballot-access scheme found in *Socialist Workers Party v. Sec'y of State*, 412 Mich. 571 (1982).  Michigan's then-existing election code permitted the names of candidates of automatic qualifying political parties on the primary ballot, but, for new political parties, the election code allowed only the party's name, not candidate names, on the same ballot.  412 Mich. at 580.  The Michigan Supreme Court held that the difference in primary-ballot specificity violated the Purity of Elections Clause because

> [the] procedure forces a "new" party to divert scarce resources and time from its political message to voter education campaigns solely designed to teach the electorate to associate its issues and the names of its candidates with the name of a political party for which voters must cast their ballots.  By contrast, political parties entitled to automatic general election ballot placement, and their candidates, face no similar burdens.  All energies and resources may be concentrated on candidate and issue identification.

*Id.* at 599.

Plaintiff has not explained how Michigan's present ballot-access scheme makes it more difficult for new political parties, as compared to those parties requalifying under § 168.560a, to associate issues and candidates with their parties.  Plaintiff instead appears to rely on *Socialist*

30

*Workers* for the more general proposition that the Purity of Elections Clause demands that Michigan's ballot-access scheme treat political parties equally. But the Court has already explained that those requalifying under § 168.560a are not conferred an impermissibly unfair advantage over new political parties.

Accordingly, the Court finds that Plaintiff is not likely to succeed in demonstrating that Mich. Comp. Laws § 168.685(1) violates the Purity of Elections Clause of the Michigan Constitution.

### D.  Plaintiff's Challenge to Mich. Comp. Laws § 168.685(1) Under Article I, § 4 and Article II, § 1 of the Federal Constitution Is Not Likely to Succeed

Plaintiff's challenge to Mich. Comp. Laws § 168.685 pursuant to Article I, § 4 and Article II, § 1 of the Federal Constitution is derivative of his Purity of Elections Clause claim. He asserts that "the clearly inconsistent operation of Michigan's current party ballot access scheme with the . . . 'Purity of Elections' Clause requirements now operates to, in turn, impose an additional federal constitutional violation under the 'Federal Election Clauses' of U.S. Const. art. I, § 4 and art. II, § 1." (Pl.'s Mot. for Prelim. Inj. at 10.) For reasons stated above, the Court finds that Plaintiff has failed to show that § 168.685(1) likely violates Article I, § 4 and Article II, § 1 of the Federal Constitution.

### E.  Plaintiff has Not Shown that the Secretary Likely Misapplied Mich. Comp. Laws §§ 168.560a, 168.685(6)

Plaintiff argues that the Secretary has misapplied the statutory language set forth in Mich. Comp. Laws §§ 168.560a, 168.685(6). Although the Court has addressed these provisions in analyzing Plaintiff's other claims, for convenience, the Court reproduces the statutory text here. Section 168.560a says,

31

> A political party the principal candidate of which received at the last preceding general election a vote equal to or more than 1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected is qualified to have its name, party vignette, and candidates listed on the next general election ballot.

Mich. Comp. Laws § 168.560a.  And, in relevant part, § 168.685(6) provides,

> If the principal candidate of a political party receives a vote equal to less than 1% of the total number of votes cast for the successful candidate for the office of secretary of state at the last preceding general November election in which a secretary of state was elected, that political party shall not have the name of any candidate printed on the ballots at the next ensuing general November election, and a column shall not be provided on the ballots for that party. . . . *The term "principal candidate" of a political party means the candidate who receives the greatest number of votes of all candidates of that political party for that election.*

Mich. Comp. Laws § 168.685(6) (emphasis added).

Plaintiff argues that under a proper interpretation of these two statutory provisions, the Socialist Party satisfied the one-percent requirement in § 168.560a during the last election.  Prior to the 2002 amendments to § 168.685(6), "principal candidate" was defined as "the candidate whose name appears nearest the top of the party column."  Mich. Comp. Laws § 168.685(6) (West 1989).  As emphasized above, § 168.685(6) now defines the term "principal candidate" without reference to the political party's column.  It follows, says Plaintiff, that in order for a political party to qualify for ballot appearance under § 168.560a, the party need not have had a "party column" on the prior ballot.  Instead, all that is required under § 168.560a is that the political party now has a candidate who received "1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected."  Plaintiff offers this reading of §§ 168.560a and 168.685(6) because Diana Demers, for example, received 80,365 votes in 2010

as a Green Party candidate (well above the one-percent threshold) and now is a Socialist Party candidate.  (*See* Compl. ¶¶ 64, 68.)

Plaintiff's reading of §§ 168.560a and 168.685(6) is strained.  In the pre-2002 version of § 168.685(6), Michigan permitted a political party to requalify under § 168.560a only if the party appeared on the prior election's ballot.  This is evident in the then-explicit reference to "the party column" of the prior ballot.  Thus, the operation of § 168.560a prior to 2002 was plain: it rewarded those political *parties* whose candidates demonstrated the requisite modicum of support by granting automatic requalification.  To accept Plaintiff's reading would be to find that § 168.560a no longer requires a political *party* to demonstrate that modicum of support; instead a party need only have a *candidate* who — under a different political party label — obtained the requisite modicum of support.  This would be a sweeping change to the operation of §§ 168.560a and 168.685(6).  The Court is reluctant to interpret the requalification scheme in this way when there is a much more plausible reason for legislature to have removed the "party column" reference: the language became surplusage when "principal candidate" was redefined as "the candidate who receives the greatest number of votes of all candidates of that political party for that election."  Restated, a political party's "principal candidate" is now the party's top vote-getter regardless of the candidate's location in the "party column" on the prior ballot.  Absent a clear showing that the legislature intended to make the significant change from a modicum of party support to a modicum of candidate support, the Court rejects Plaintiff's interpretation of § 168.560a and § 168.685(6).  Plaintiff has therefore not shown that the Secretary likely misapplied those provisions.

**F.  The Balance of Preliminary Injunction Factors Does Not Justify An Injunction**

As noted at the outset, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  There is no reason to deviate from the norm in this case.  The irreparable harm factor favors Plaintiff: if an injunction does not issue, no Socialist Party candidate will appear on Michigan's November 6, 2012 general election ballot.  But the harm to others from an injunction militates against awarding preliminary relief.  The Secretary informs the Court that the general election ballots were certified on September 9, 2012 and that the Secretary's office "is now in the midst of a massive coordinated effort with 83 counties, 1,035 local jurisdictions, and 4,009 precincts to have ballots approved, printed, and distributed to overseas voters by September 22, 2012."  (ECF No. 24, Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. at 18.)   Although Plaintiff offers an affidavit (from another case) suggesting that an injunction would not be overly disruptive of the printing and distribution process, Plaintiff's affiant also acknowledges that an injunction at this point "would be cutting it close" and that state or county staff would likely have to work overtime to ensure that the ballots are printed on time.  (Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Prelim. Inj., Ex. A, Mizzi Decl. ¶ 7.) Accordingly, the public interest factor disfavors an injunction.  *See Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) (finding that "it would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season.  It wasn't filed until June 27, only a little more than four months before the election . . . .  By waiting as long as he did to sue, and despite the strenuous efforts by the district court and this court to expedite the litigation, [plaintiff] created a situation in which any remedial order would throw the state's preparations for the election into turmoil.").  On balance, the Court finds that Plaintiff is unlikely to succeed on the merits, and, primarily for this

34

reason, Plaintiff has not carried his heavy burden of showing that the "extraordinary remedy," *Overstreet*, 305 F.3d at 573, of a preliminary injunction is justified.

## IV.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that Plaintiff's Motion for Preliminary Injunction (ECF No. 12) be DENIED.

## V. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation by the district judge within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR

72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  September 20, 2012


### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 20, 2012.


s/Jane Johnson
Deputy Clerk