UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MATT ERARD,                                  Case No. 2:12-cv-13627

                                             District Judge Stephen J. Murphy, III
              Plaintiff,                      Magistrate Judge Laurie J. Michelson

v.


MICHIGAN SECRETARY OF STATE RUTH JOHNSON,
in her official capacity,

              Defendant.
                                                                              /

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION TO DISMISS [46]

Plaintiff Matt Erard wants to run for Congress as a nominee of the Socialist Party of Michigan and desires to vote for the Party's other nominees for political office. The Socialist Party of Michigan, however, has not been able to qualify for placement on Michigan's general-election ballot since 1976. In 2012, the Socialist Party made some efforts to satisfy the requirements of Michigan Compiled Laws § 168.685 and thereby petition Michigan's Secretary of State, Defendant Ruth Johnson, to place the Party on the November 2012 general-election ballot. But the 925 signatures the Socialist Party of Michigan collected fell well short of the 32,261 required by § 168.685(1). Erard maintains that this was, in significant part, because § 168.685, when combined with other related ballot-access regulations, is too onerous. In fact, Erard believes that it so difficult for the Socialist Party of Michigan to petition its way onto Michigan's general-election ballot that Michigan's petitioning scheme impermissibly burdens his First and Fourteenth Amendment rights to associate for the advancement of his political beliefs and to cast his vote effectively. On this

ground, and others, he asks the Court to declare § 168.685 unconstitutional on its face and as applied to him. (Dkt. 44, Am. Compl. at 97.)

Now before the Court for a report and recommendation is the Secretary's Motion to Dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. 46, Def.'s Mot. to Dismiss.) Erard opposes the Secretary's motion. (Dkt. 48, Pl.'s Resp. to Def.'s Mot. to Dismiss.) The Court has heard oral argument and carefully reviewed the Amended Complaint and the briefing. As detailed below, this Court believes that it has subject-matter jurisdiction over the claims in the Amended Complaint. It also concludes that the Secretary has not carried her burden in showing that Erard's claims are barred by prior, related adjudication. The Court further finds that Erard's First Amendment challenge to Michigan Compiled Laws §§ 168.685(1) and 168.544c is plausible, and, therefore, states a claim upon which relief may be granted. All other claims, however, should be dismissed because, in the manner pled, they do not show that the Secretary has acted unlawfully in applying Michigan's ballot-access scheme to the Socialist Party of Michigan.

## I.

### A.

Michigan provides three ways for a political party to place its nominees for office on Michigan's general-election ballot.

First, political parties whose principal candidate received at least five percent of the "total vote cast for all candidates for the office of secretary of state in the last preceding state election," both in the State and all political subdivisions affected, qualify to appear on Michigan's primary ballot. *See* Mich. Comp. Laws § 168.532. These parties thus place their candidates on Michigan's

2

general-election ballot via a primary election. *See* Mich. Comp. Laws § 168.531. The Republican Party of Michigan and the Democratic Party of Michigan are the only two parties that qualify to place candidates on Michigan's November 2014 general-election ballot under this method. *State of Michigan Political Party Status* at 1.[1]

A political party that does not meet the five-percent threshold may still qualify to have its candidates listed on the general-election ballot based on prior election results. Specifically, Michigan Compiled Laws § 168.560a provides:

> A political party the principal candidate of which received at the last preceding general election a vote equal to or more than 1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected is qualified to have its name, party vignette, and candidates listed on the next general election ballot.

To qualify for the November 2014 general-election ballot via § 168.560, a party's "principal candidate" must have received at least 16,083 votes in the November 2012 election, i.e., one percent of the approximately 1,608,300 votes cast for secretary of state during the November 2010 election. *See* Mich. Comp. Laws § 168.560a; *State of Michigan Political Party Status* at 2.

---

[1]At several points in this Report and Recommendation the Court cites the following public records available on the Michigan Secretary of State website: (1) Michigan Secretary of State, *State of Michigan Political Party Status* (May 16, 2013), *available at* http://michigan.gov/documents/sos/ Pol_Party_Status_2011_5_352715_7.pdf; (2) Michigan Secretary of State, *New Political Party Qualification* (May 2013), available at http://www.michigan.gov/documents/sos/ New_Political_Party_Qualification_424178_7.pdf; and (3) Michigan Secretary of State, *Performance of Minor Parties in Michigan General Elections* (April 2013), http://www.michigan.gov/sos/0,4670,7-127-1633_8722---,00.html. The Court may consider public documents in resolving a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). For readability, the Court will refer to these documents by their title only.

Prior to 2002, "[t]he term 'principal candidate' of any party mean[t] the candidate whose name appears nearest the top of the party column." Mich. Comp. Laws § 168.685(6) (West 2001). In 2002, the Michigan legislature relaxed the definition such that Michigan Compiled Laws § 168.685(6) now provides that "[t]he term 'principal candidate' of a political party means the candidate who receives the greatest number of votes of all candidates of that political party for that election." In other words, a party's "principal candidate" is now that party's top vote-getter—regardless of where that candidate was listed within the party's column on the ballot. Erard emphasizes that the amendment's effect has been considerable: "every ballot-qualified minor party's 'principal' (i.e. highest vote-totaling) candidate widely surpassed the minimum vote threshold" set forth in § 168.560a in "each of the six general elections held since the enactment of 2002 P.A. 399 . . . ." (Am. Compl. ¶ 35.)

The third route to the ballot is the avenue presently open to the Socialist Party of Michigan, and therefore, is the method under scrutiny in this case. Parties that do not qualify to place their candidates on Michigan's general-election ballot through either of the first two methods may still do so by filing a petition with Michigan's Secretary of State that satisfies the requirements of Michigan Compiled Laws § 168.685.

Prior to 1988, § 168.685(1), like § 168.560a, provided that the required number of petition signatures was equivalent to one percent of the votes cast for the secretary of state in the prior secretary-of-state election. (Am. Compl. ¶ 24.) If this were still the standard, a petitioning party would only need to collect 16,083 signatures to place candidates on the November 2014 general-election ballot.

4

But in 1976, six political parties filed ballot-access petitions, which, when added to the parties requalifying for the ballot based on their prior-election vote totals, resulted in ten parties seeking ballot access. (Am. Compl. ¶ 26 & n.37.) This was problematic because the mechanical-lever voting machines then in use were capable of handling a ballot with at most nine parties. (Am. Compl. ¶ 27.) In 1987, then-Secretary of State Richard Austin, apparently concerned about Michigan's 27 counties still using mechanical-lever machines, requested that Michigan's legislature raise the petition requirements. (Am. Compl. ¶ 26.)

In 1988, the Michigan legislature passed 1988 P.A. 116, which amended Michigan Compiled Laws § 168.685(1) to base the required number of signatures on the considerably higher number of votes cast for Michigan's governor rather than the secretary of state. In full, that subsection now reads:

> The name of a candidate of a new political party shall not be printed upon the official ballots of an election unless the chairperson and secretary of the state central committee of the party files with the secretary of state, not later than 4 p.m. of the one hundred-tenth day before the general November election, a certificate signed by the chairperson and secretary of the state central committee bearing the name of the party, *together with petitions bearing the signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast for all candidates for governor at the last election in which a governor was elected*. The petitions shall be signed by at least 100 registered electors in each of at least 1/2 of the congressional districts of the state. All signatures on the petitions shall be obtained not more than 180 days immediately before the date of filing.

Mich. Comp. Laws § 168.685(1) (emphasis added).

Section 168.685(1) applies to the upcoming November 4, 2014 general election as follows. Michigan last elected a governor in 2010. The number of votes cast at that election was 3,226,088. *New Political Party Qualification* at 1. Thus, for the November 4, 2014 election, the Socialist Party

5

of Michigan has a "180 day[]" period prior to July 17, 2014 (the "one hundred-tenth day before the general November election") to collect 32,261 signatures of registered and qualified electors. *See* Mich. Comp. Laws § 168.685(1); *New Political Party Qualification* at 1.

In addition to the requirements of § 168.685(1), Erard identifies several other statutory provisions that allegedly contribute to the difficulty in completing Michigan's petition route to the ballot. First, Michigan limits who may circulate the Socialist Party's petitions:

> At the time of circulation, the circulator of a petition shall be a registered elector of this state. At the time of executing the certificate of circulator, the circulator shall be registered in the city or township indicated in the certificate of circulator on the petition. . . .

Mich. Comp. Laws § 168.544c(3).

Second, Erard maintains that Michigan Compiled Laws § 168.685(3) and (4) increase the difficulty in collecting signatures. Subsection 168.685(3) requires every petition to contain the following language:

PETITION TO FORM NEW POLITICAL PARTY

* * *

> Warning: A person who knowingly signs petitions to organize more than 1 new state political party, signs a petition to organize a new state political party more than once, or signs a name other than his or her own is violating the provisions of the Michigan election law.

Mich. Comp. Laws § 168.685(3); *see also* Mich. Comp. Laws § 168.685(8). Subsection (4), along with § 168.544c, provides that this "Warning" language must be printed in "12-point boldface type," the title in 24-point font, and the remainder of the petition in 8-point type. Erard says that the mandatory petition language, printed in large, bold type, has a "highly chilling impact" on potential signers because it suggests to them that, by signing the petition, they are committing to the task of

"form[ing]" and "organiz[ing]" a new political party; moreover, the voter may be deterred because the commitment is public and the public may have negative views of the petitioning party. (Am. Compl. ¶¶ 4, 5, 175-77.) Erard also points out that, due to the absence of time-limiting language in § 168.685(3) (and in the implementing provision Mich. Comp. Laws § 168.685(8)), voters are deterred from signing a ballot-access petition unless they are confident that they never signed another petition in the past and never will in the future. (Am. Compl. ¶ 190.)

Third, Erard claims that 2012 amendments to the Michigan Campaign Finance Act have made collecting the requisite number of petition signatures still more difficult. Although there are exceptions, "a corporation, joint stock company, domestic dependent sovereign, or labor organization," is no longer permitted to make a "contribution . . . for the qualification of a new political party." *See* Mich. Comp. Laws §§ 169.204, 169.254(1). In addition, Erard says that "a 'new' political party seeking to qualify for the ballot must now disclose each and every contribution received or expenditure made in support of that effort, through the filing of quarterly and openly online-published 'campaign statement' reports to Defendant's Bureau of Elections." (Am. Compl. ¶ 46); *see also* Mich. Comp. Laws §§ 169.203(4), 169.211, 169.229(1)(a), 169.233(4). Erard says that because the Michigan Campaign Finance Act requires "itemized disclosure of *all* contributions to a political party committee" and because of the Socialist Party's "compelling need to protect the privacy of its dues-paying members and contributors," the Socialist Party of Michigan does not accept more than $1,000 for election-related expenses during any calendar year so as to qualify for a financial reporting waiver. (Am. Compl. ¶ 47.)

**B.**

The Socialist Party of the United States of America was founded in 1901 and "is a national political party." (Am. Compl. ¶ 16.) Throughout its 112-year history, the Socialist Party of the United States of America "has distinguished itself through its specific orientation to providing political representation to those segments of the State electorate who possess no financial assets to sell on the market other than their individual labor power." (Am. Compl. ¶ 51.) This is "in accordance with the [P]arty's central political aim of replacing the current profit-based system of private industrial wealth generation with a classless system of social ownership and democratic control of the economy tailored to producing for the purpose of meeting human and social needs." (Am. Compl. ¶ 51.)

The Socialist Party of Michigan is the "chartered Michigan State-party branch" of the Socialist Party of the United States of America. (Am. Compl. ¶ 17.) "During the past eight years well over 250 Michigan residents have officially joined the Socialist Party as official dues-paying Party members." (Am. Compl. ¶ 147.) The vast majority of the Socialist Party of Michigan's members earn less than $20,000 per year. (Am. Compl. ¶ 52.)

Plaintiff Matt Erard is "a twelve-year-long continuous member of the Socialist Party" and "identifies with the Socialist Party as the only political party for which his vote could be cast with any measure of political expression to his fundamentally held views." (Am. Compl. ¶¶ 14.d, e.) Erard is the Treasurer of the Socialist Party of the United States of America's "qualified party national committee" and the Secretary of the Socialist Party of Michigan. (Am. Compl. ¶ 14.a.) In 2012, Erard was nominated by the Socialist Party for one of Michigan's seats in the United States

8

House of Representatives and circulated ballot-access petitions on the Party's behalf. (Am. Compl. ¶¶ 14.a, 14.d.) Erard intends to run for Congress under the Socialist Party label in 2014. (*Id.*)

### C.

Leading up to the November 2012 general election, Erard and the Socialist Party of Michigan attempted to comply with Michigan Compiled Laws § 168.685 but were only able to collect 925 petition signatures. (Def.'s Mot. to Dismiss at 10.) As this was well shy of the 32,261 required under § 168.685(1), Defendant Secretary of State Ruth Johnson, charged with enforcing that provision, rejected the Socialist Party's petition. Erard then filed this suit against the Secretary seeking a declaration that § 168.685 is unconstitutional and an order directing the Secretary to place the Socialist Party of Michigan on the November 2012 general-election ballot. (*See* Dkts. 1, 3, 5.)

On September 20, 2012, following expedited briefing and oral argument, this Court recommended that Erard's motion for preliminary relief be denied. (Dkt. 31, R. & R. to Deny Pl.'s Mot. Prelim. Inj.) On October 29, 2012, District Judge Stephen J. Murphy, III, overruled Erard's objections and adopted this Court's report and recommendation. (Dkt. 40, Order Adopting R. & R. to Deny Pl.'s Mot. Prelim. Inj.) He reasoned in part,

> Assuming it is even possible to grant Erard the relief he seeks at this late date, it would create a substantial burden for the state of Michigan and would be against the public interest in maintaining the stability and integrity of the political process. Moreover, the Court agrees with the magistrate judge's assessment that Erard has failed to show a substantial likelihood of success on the merits.

(*Id.* at 5.)

**D.**

Following Judge Murphy's preliminary injunction ruling, Erard filed the Amended Complaint that the Secretary now moves to dismiss. (Dkt. 44, Am. Compl.) Although Erard places his claims under four labels (Count 1, 2, 3, and 4), it appears that he raises six theories for relief.

The first, under the label "Count 1," is a discrimination theory. Erard emphasizes that minor political parties requalifying under § 168.560a have "a substantial unfair advantage" over parties seeking to qualify via § 168.685 because petitioning parties have to demonstrate the support of twice as many voters. (Am. Compl. ¶¶ 160-62.) Although Erard acknowledges that the minor parties now requalifying under § 168.560a had to first qualify via § 168.685, he claims that the Socialist Party's task is more difficult because of the recent amendments to the Michigan Campaign Finance Act. (Am. Compl. ¶¶ 164-65.) Erard further pleads that § 168.685 discriminates against "political parties with limited financial resources" because collecting 32,261 signatures costs "tens of thousands of dollars." (Am. Compl. ¶¶ 170-71.) Based on these allegations, Erard claims violations of the "Fourteenth Amendment" of the United States Constitution and the Purity of Elections Clause of the Michigan Constitution.

"Count 2" is Erard's First Amendment claim. (Am. Compl. ¶¶ 184-98.) He asserts that Michigan Compiled Laws § 168.685, in combination with other requirements related to signature collection, burdens his First Amendment right to associate for the advancement of political beliefs and to effectively cast his vote.

Erard's third theory is that the Secretary has failed to acknowledge that one or more of the Socialist Party's nominees, although ultimately appearing on the ballot under another party's label, obtained votes exceeding the one-percent requirement of § 168.560a. (*See* Am. Compl. ¶¶ 166, 178,

200-05.) By failing to credit the Socialist Party with the votes cast for these candidates, the Secretary has allegedly violated the Fourteenth Amendment of the United States Constitution, the Purity of Elections Clause of Michigan's Constitution, and Michigan statutory law. (*See* Am. Compl. ¶¶ 166, 178, 200-05.)

Fourth, Erard alleges that the Secretary has inconsistently applied the statutory language of § 168.560a and its related provision, § 168.685(6). (Am. Compl. ¶¶ 173-74, 206.) He claims that, for certain minor parties, the Secretary "retroactively" applied the more forgiving, post-2002 definition of "principal candidate" (i.e., top vote-getter) to the votes cast during the 2000 general election, but did not do the same for the Socialist Party. (Am. Compl. ¶¶ 173-74, 206.)

Fifth is Erard's claim that the Secretary violated the plain language of Michigan Compiled Laws § 168.658(2) by failing to submit the Socialist Party's 2012 petition to the Board of State Canvassers for an official declaration as to the petition's sufficiency. (*See* Am. Compl. ¶ 208.)

Sixth are Erard's derivative claims based on the "Federal Elections Clauses" of the U.S. Constitution, Article I, § 4 and Article II, § 1.

## II.

Before determining whether the Amended Complaint states a claim upon which relief may be granted, the Court addresses a number of jurisdictional issues raised by the Secretary. She asserts that sovereign immunity precludes this Court from awarding Erard declaratory relief. (Def.'s Mot. to Dismiss at 4.) The Secretary also argues that the case or controversy before the Court is moot because the November 2012 election has passed. (Def.'s Mot. at 4.) Relatedly, she claims that any potential controversy involving future elections has not ripened and that Erard lacks standing to challenge Michigan's ballot-access scheme. (Def.'s Mot. at 4-5.) Although the Court recognizes that

11

the justiciability doctrines have prudential aspects, it remains that these four arguments implicate a federal court's subject-matter jurisdiction. *See Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006); *Susan B. Anthony List v. Driehaus*, No. 11-3894, 2013 WL 1942821, at *3 (6th Cir. May 13, 2013). So the Court will address these four bases for dismissal first.

### A.

The Secretary claims that Erard's suit against her in her official capacity is, in effect, a suit against a sovereign state, and, therefore, this Court must dismiss Erard's claims for declaratory relief. (Def.'s Mot. to Dismiss at 4.) The Court disagrees. "[O]fficial-capacity claims for declaratory relief are not barred by the Eleventh Amendment, even if the officers' future compliance with federal law would have some 'ancillary' effect upon the State treasury." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994) (citing *Edelman v. Jordan*, 415 U.S. 651, 660 (1974)); *see also Ex Parte Young*, 209 U.S. 123, 159-60 (1908). Thus, Erard's claims for declaratory relief should not be dismissed on the basis of sovereign immunity.

### B.

The Secretary also says that Erard's claims are moot. (Def.'s Mot. to Dismiss at 4.) "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (internal quotation marks omitted). The Secretary maintains that the controversy before the Court falls within this standard because "the 2012 general election is over and the time periods for candidates and parties to seek access to the ballot for the 2014 or 2016 elections have not yet begun to run." (Def.'s

12

Mot. to Dismiss at 4.) "Thus," says the Secretary, "this Court cannot render the requested injunctive relief." (*Id.*)

The Sixth Circuit says otherwise. In *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006), the Libertarian Party of Ohio ("LPO") and three of its members sued Ohio's secretary of state asserting primarily that two of Ohio's ballot-access requirements impermissibly burdened their First and Fourteenth Amendment rights. *Id.* at 582. In deciding the LPO's appeal, the Sixth Circuit recognized that it was being asked to resolve a controversy long after the election that had prompted it. *See id.* at 583-84. Nonetheless, the controversy was not moot because it fell within the "capable of repetition, yet evading review" exception to that doctrine. *Id.* at 584. The Court of Appeals found the first of the exception's two requirements to be "easily satisfied": "Legal disputes involving election laws almost always take more time to resolve than the election cycle permits." *Id.* at 584. As to the exception's second prong, the Appellate Court reasoned:

> [I]t is likely that the LPO will once again seek to place candidates on the general election ballot in 2008. As a result, the party again will face the requirements that its candidates be selected in a March primary and that it file a petition for party recognition 120 days in advance of this primary. Considering the "somewhat relaxed" repetition standard employed in election cases, *see* [*Lawrence v. Blackwell*, 430 F.3d 368, 372 (6th Cir. 2005)], this issue easily satisfies the "capable of repetition, yet evading review" exception and is not moot.

462 F.3d at 584-85.

Here, Erard's challenge to Michigan's ballot-access scheme will "take more time to resolve than the election cycle permits." *Libertarian Party of Ohio*, 462 F.3d at 584. And the controversy preceding the November 2012 election is "capable of repetition": Erard explicitly pleads that he intends to run as a Socialist Party candidate for United States Congress in 2014 and that the Socialist

13

Party is the only party for which his "vote could be cast with any measure of political expression to his fundamentally held views." (Am. Compl. ¶¶ 14a, 14d & n.17.) In short, Erard has adequately demonstrated that his challenge to Mich. Comp. Laws § 168.685(1) is not moot because it is "capable of repetition, yet evading review."

The Secretary's reliance on the mootness doctrine is not wholly misplaced, however. Although not raised as a separate count, Erard seeks relief for the Secretary's failure to submit the Socialist Party's November 2012 petition—containing only 925 signatures—to the Board of State Canvassers for an official declaration of sufficiency or insufficiency. (Am. Compl. ¶ 208 & n.235.) This claim is moot. In *Libertarian Party of Ohio*, the Sixth Circuit further explained that mootness is a claim-level inquiry. 462 F.3d at 584. In addition to asserting that Ohio's petition requirements unconstitutionally burdened its First Amendment rights, the LPO claimed that Ohio's secretary of state had improperly rejected the LPO's petition for "not follow[ing] the exact wording required by Ohio law." *Id.* at 584. The Sixth Circuit explained the "unique factual situation" leading to the LPO's use of non-conforming language and concluded that there was no "reasonable expectation or demonstrated probability that the LPO or any other political group [would] be injured by Ohio's requirement of strict compliance with election laws." *Id.* So too here: Erard has not pled facts showing a "reasonable expectation or demonstrated probability" that the Secretary will again fail to submit the Socialist Party's petition to the Board of State Canvassers for an official declaration of sufficiency or insufficiency as required by Michigan Compiled Laws § 168.685(2). This claim is therefore moot. It follows that Erard's derivative claim that the Secretary violated the "Federal Elections Clauses" of the U.S. Constitution by failing to submit the petition to the Board is also moot.

## C.

The Secretary next claims that the present controversy is not yet ripe for resolution. (*See* Def.'s Mot. at 5; Def.'s Reply at 2.) In particular, the Secretary says that "it is wholly speculative whether [Erard] will [run as a Socialist Party candidate in future elections], whether the Party will nominate Erard as a candidate in the future, whether the Socialist Party will attempt to circulate petitions for inclusion on ballot as a new political party, and whether the Party will fail to file a sufficient number of signatures." (Def.'s Mot. at 5.) The Secretary also points out that "the Party's financial circumstances or membership numbers or volunteer efforts could change substantially in the future." (Def.'s Reply at 2.) She additionally argues that Erard challenges § 168.685 as "presently applied" but that she is not now applying that statute against the Socialist Party. (*See* Def.'s Reply at 1-2.)

As an initial matter, the Court notes that to apply the ripeness doctrine in the manner suggested by the Secretary—that Erard's challenge to Michigan Compiled Laws § 168.685 was ripe for resolution prior to the November 2012 election, but must be dismissed as unripe as to the November 2014 election—creates tension with the broad "capable of repetition, yet evading review" exception to the mootness doctrine in election-law cases. In *Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005), the Sixth Circuit found that the mootness exception applied even though there was "no evidence in the record addressing whether [Plaintiff] Lawrence plans to run for office or [Plaintiff] Shilo plans to vote for an independent candidate in a future election." *Id.* at 371. According to the Sixth Circuit, "Courts have applied the capable of repetition yet evading review exception to hear challenges to election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future." *Id.* at 372.

15

And even examining the ripeness doctrine independently, the controversy before the Court is ready for resolution. Requiring a controversy to ripen "prevents federal courts from 'entangl[ing]' themselves in a 'premature adjudication' of legal matters, even ones involving constitutional issues, 'that may with time be satisfactorily resolved at the local level and that may turn out differently in different settings.'" *Susan B. Anthony List v. Driehaus*, No. 11-3894, 2013 WL 1942821, at *3 (6th Cir. May 13, 2013) (quoting *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010)). "Three factors guide the ripeness inquiry: (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir.2012) (internal quotation marks omitted). The inquiry focuses on the present state of the controversy. *See Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974) ("[S]ince ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern."); *American Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 302 n.4 (2d Cir. 1989) ("[I]t is irrelevant whether the case was ripe for review when the complaint was filed.").

The balance of these factors indicates that Erard's claims are now ripe for adjudication. As to the first factor, Erard has unequivocally expressed his intent to run as a Socialist Party candidate and vote for Socialist Party candidates during the 2014 general election. To do so, the Socialist Party must meet the standards set forth in Michigan Compiled Laws § 168.685(1). The second factor, however, slightly favors the Secretary's position: as to the upcoming election, Erard and the Socialist Party's attempts to collect signatures are not yet documented. Still, it is doubtful that the

16

Socialist Party's petition-circulation resources will undergo a marked change before the start of the next petition-circulation period. Additionally, Erard has pled present harm: "[the Socialist Party] presently faces exclusion from partisan special and local elections being conducted prior to the 2014 General Election date" and is presently "suffer[ing] injury to its . . . membership recruitment and associational expression" as a result of not being recognized as a ballot-eligible party. (Pl.'s Resp. to Def.'s Mot. to Dismiss at 4.)

The controversy before the Court is ripe for resolution.

**D.**

The Secretary also asserts that Erard lacks standing. But her only arguments in this regard are those presented under the umbrellas of mootness and ripeness. (*See* Def.'s Mot. at 5; Def.'s Reply at 2.) As such, an extended, separate analysis is unnecessary. *See Warth v. Seldin*, 422 U.S. 490, 499, n.10 (1975) ("The standing question . . . bears close affinity to questions of ripeness whether the harm asserted has matured sufficiently to warrant judicial intervention and of mootness whether the occasion for judicial intervention persists."); Alan Wright et al., 13A Fed. Prac. & Proc. Juris. § 3531 at 21 (3d ed. 2008) ("Both ripeness and mootness . . . could be seen as providing time-bound perspectives on the injury inquiry of standing."). Simply stated, Erard wants to run for office as a Socialist Party candidate and he wants to vote for other Socialist Party candidates at the next election; he can do neither of things, he says, because Michigan's petition route to the ballot is discriminatory and too onerous. Erard has standing to pursue these claims.

17

### III.

In addition to claiming that this Court lacks subject-matter jurisdiction, the Secretary has also moved to dismiss Erard's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In determining whether relief under that Rule should be granted, this Court is to accept the non-conclusory allegations in Erard's Amended Complaint as true, and draw reasonable inferences from those allegations in favor of Erard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009). But the Court is not to speculate in Erard's favor, nor must the Court accept the many legal conclusions he has drawn in the Amended Complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). After applying these standards, a claim warrants dismissal if it is not "plausible"—more than "possib[le]" but not necessarily "probab[le]"—that the Secretary is liable for the conduct that the claim alleges. *Iqbal*, 556 U.S. at 678. Determining whether a claim is plausible requires this Court "to draw on its judicial experience and common sense." *Id.* at 679.

As noted at the outset, Erard's Amended Complaint alleges numerous constitutional and statutory violations under six theories. The Secretary asserts that this Court does not have to consider the merits of any of them because, in a prior litigation, the Michigan courts did. (Def.'s Mot. to Dismiss at 6.) The Court will addresses this argument first. Because collateral estoppel does not bar the claims Erard raises in this suit, the Court then proceeds to a claim-by-claim plausibility analysis. The Court concludes that only Erard's First Amendment claim is adequately pled.

### A.

The Secretary says that "Erard's challenge to § 685(1) is barred by collateral estoppel." (Def.'s Mot. at 6.) The basis for this assertion is a 2010 lawsuit filed by the Socialist Party of

Michigan against Michigan's then-Secretary of State, Terri Lynn Land. *Socialist Party of Michigan v. Land*, No. 10-867, slip order (Mich. 30th Cir. Ct. Aug. 25, 2010) (order dismissing case with prejudice), *aff'd*, No. 299951 (Mich. Ct. App. Sept. 3, 2010) (per curiam), *lv. denied*, 796 N.W.2d 69 (Mich. 2011).[2]

Under the Full Faith and Credit Act, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). This Court therefore looks to Michigan law. *See id.* The Secretary has the burden of establishing that collateral estoppel applies. *Detroit v. Qualls*, 434 Mich. 340, 454 N.W.2d 374, 383 (1990). This means that the Secretary must show that

> 1) the parties in both proceedings are the same or in privity,
> 2) there was a valid, final judgment in the first proceeding,
> 3) the same issue was actually litigated in the first proceeding,
> 4) that issue was necessary to the judgment, and
> 5) the party against whom preclusion is asserted (or its privy) had a full and fair opportunity to litigate the issue.

*United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004) (paragraphing altered) (citing *People v. Gates*, 452 N.W.2d 627, 630 (Mich. 1990)).

As to all but one claim, the Secretary has not shown that an adjudication of the claims Erard asserts in this suit was "necessary to the judgment" in *Land*.

---

[2]The complaint in *Socialist Party of Michigan v. Land* is Exhibit 1 to the Secretary's supplemental preliminary injunction brief (Dkt. 27, Ex. 1). The trial-court's oral ruling and subsequent order in *Socialist Party of Michigan v. Land* are, respectively, Exhibit 3 to the Secretary's motion to dismiss (Dkt. 46, Ex. 3) and Exhibit 3 to the Secretary's supplemental preliminary injunction brief (Dkt. 27, Ex. 3). The Michigan Court of Appeals decision is Exhibit 1 to the Secretary's motion to dismiss. (Dkt. 46, Ex. 1.)

In July 2010, the Socialist Party of Michigan, and one of its supporters and nominees, Dwain Reynolds, filed a complaint in Michigan's Circuit Court for the County of Ingham that is, in many respects, similar to Erard's Amended Complaint. *See* Complaint, *Socialist Party of Michigan v. Land*, No. 10-867 (Mich. 30th Cir. Ct. filed July 21, 2010). For instance, the state-court plaintiffs asserted that Secretary Land's enforcement of Michigan Compiled Laws § 168.685(1) violated, among other things, their First Amendment rights and Michigan's Purity of Elections clause. *See id.* The Socialist Party also claimed that it was entitled to ballot placement because one of its nominees, although ultimately appearing on the ballot under another party's label, received votes exceeding the ballot requalification standard set forth in § 168.560a. *See id.*

In August 2010, Ingham County Circuit Court Judge William Collette held a hearing and denied the Socialist Party of Michigan's motion for summary disposition. Aug. 18, 2010 Summ. Disp. Hr'g Tr., *Socialist Party of Michigan v. Land*, No. 10-867 (Mich. 30th Cir. Ct. Aug. 18, 2010). The basis for Judge Collette's ruling is ambiguous. At the beginning of the hearing, Judge Collette appeared to inquire about the Socialist Party's constitutional claims: "As I understand, the principal part of your argument is . . . that the number of signatures needed is a fairly large number, and it's difficult for anybody to get on the ballot with that number because of the Governor's race and all that." *Id.* at 5. But later in the hearing, Judge Collette's focus shifted to the Socialist Party of Michigan's delay in bringing its case: "But here is what I am talking about. I was here sitting at this bench in 2002. I was here in '03, '04, '05, and it looks like a long time to come hopefully. . . . [I]nstead of waiting until a matter of days, weeks, a few weeks before a ballot has to be prepared, your party could have come in a year ago, filed a lawsuit, had a leisurely hearing, a determination, adjusting of things." *Id.* at 10. Judge Collette was also troubled by the fact that the Socialist Party

had not made any effort to satisfy the requirements of § 168.685(1): "A real concern I think that I have is that your clients have made no effort, as far as I can tell, to obtain any . . . petition signatures. They have done nothing other than come in and complain that the law is unfair. So even if I said we'd use the lower standard, you wouldn't be able to do it. So you just simply want them on the ballot with no requirements of doing anything, which makes no sense to me." *Id.* Then, in ruling on the Socialist Party's motion, Judge Collette reasoned:

> The Court is of the opinion that all laws that are passed have a certain chilling effect on the rights of people. It doesn't make them unconstitutional because they place a burden on someone to perform something in order to obtain the rights and benefits of the law. Every entity that chooses to go on the ballots in Michigan has the same obligation. It is not a large obligation, in my opinion, for an organization that takes the time and trouble to go out and try to obtain the signatures that they need.

> Your client has sat on their rights for years and done nothing since 1974 or '76, or whatever, and now comes in and wants us to just place them on the ballot without any requirement that they meet the standards that other people have to meet or any effort to obtain that. And that is not the way the law works. There has—the reason the law is like this is clear.

> I remember when we had ballots when I was a youngster, long before you, where the ballots were like this. We had parties all over the place. I mean, the lawn mower repair party of East Lansing and stuff, good heavens. So there has to be some modicum of sensibility here, and one of them is that you got to show you are viable, and your organization isn't viable.

*Id.*

Judge Collette's ruling is susceptible to two reasonable interpretations. In the first part of his ruling, Judge Collette appears to opine that Michigan's petition route to the general-election ballot is not too onerous nor is it inequitable to the Socialist Party of Michigan. This supports the Secretary's claim that collateral estoppel might apply to at least some of the claims Erard raises in

21

this case. Still, Judge Collette never mentions, for example, the First Amendment. And the second paragraph of his ruling, especially when read in conjunction with the statements he made earlier in the hearing, indicates that Judge Collette believed that the Socialist Party of Michigan's claims were barred by laches or that, as a matter of equity, relief from § 168.685(1) should be denied because the Socialist Party had not even attempted to comply with that provision's requirements.

Because it is reasonable to interpret Judge Collette's ruling as based in equity, the Secretary has not carried her burden of demonstrating that Judge Collette's ruling necessarily decided the claims Erard raises in this suit. *See Ditmore v. Michalik*, 244 Mich. App. 569, 578, 625 N.W.2d 462, 467 (2001) ("Collateral estoppel applies only when the basis of the prior judgment can be clearly, definitely, and unequivocally ascertained.").

The Michigan Court of Appeals' decision reinforces this interpretation. True, the Michigan Court of Appeal did acknowledge the constitutional nature of the Socialist Party's claims:

> Because it is undisputed that plaintiffs did not satisfy the requirements of MCL 168.685, indeed they made no attempts to qualify for the ballot, plaintiffs' entitlement to relief depends on their ability to establish that the statute is unconstitutional. Plaintiffs argue that the requirements of MCL 168.685 are overly burdensome in terms of both the number of petition signatures required and the costs involved in circulating petitions to obtain the necessary number of signatures. They maintain that the statute unfairly disadvantages new or minor parties. . . .

*Socialist Party of Michigan v. Land*, No. 299951, slip op. at 2 (Mich. Ct. App. Sept. 3, 2010) (per curiam). But then, in ruling on the Socialist Party's appeal, the Michigan Court of Appeal's characterized the Socialist Party's complaint as one sounding in equity:

> Although plaintiffs label their argument in terms of an equal protection challenge, they do not apply an equal protection framework to their analysis of MCL 168.685. *See Harvey v Michigan*, 469 Mich 1, 6-7; 664 NW2d 767 (2003). *Rather, plaintiffs'*

22

> *argument sounds more in equity than constitutional law*. Plaintiffs contend, without undertaking any effort to satisfy the statutory requirements to access the ballot, that the burden of doing so is too great, and this Court should direct their placement on the November ballot. We disagree and find no merit to plaintiffs' argument that MCL 168.685 should be invalidated on the basis of an equal protection argument.

*Id.* at 2 (emphasis added). Based on the foregoing, it may not have been necessary for the Court of Appeals to reach the merits of the claims that Erard raises here—the Michigan Court of Appeals may have construed the Socialist Party's appeal as "sound[ing] in equity."

But even if this Court were to conclude that the Michigan Court of Appeals unambiguously characterized the Socialist Party's complaint as one premised on the Equal Protection Clause, that would not help the Secretary. Erard disavows any such claim in this suit: "Plaintiff has not raised any arguments for specific or separate assessment under the Equal Protection Clause in this case." (Pl.'s Resp. to Def.'s Mot. to Dismiss at 10.)

Accordingly, the Court concludes that the Secretary has not shown that in affirming Judge Collette's decision, that it was necessary for the Michigan Court of Appeals to have reached the merits of the claims Erard raises in this suit. *See Ditmore*, 244 Mich. App. at 578; 625 N.W.2d at 467.

Except for one claim. After addressing the Socialist Party's equity or equal-protection claim, the Michigan Court of Appeals then rejected the Socialist Party's claim that one of its nominees, although ultimately appearing on the ballot under another party's label, received the votes required for party requalification under § 168.560a. *See Land*, No. 299951, slip op. at 2. In particular, the state appeals court said: "We find no merit to plaintiffs' reliance on MCL 168.560a. . . . Plaintiff Socialist Party of Michigan was not a designated party on the November 2008 ballot, and therefore

23

had no 'principal candidate.' On the record presented, § 560a does not entitle plaintiffs to a place on the ballot in the November 2010 election." *Land*, No. 299951, slip op. at 2. It appears that Erard has raised an identical claim in this suit. (*See* Am. Compl. ¶¶ 166, 178, 200-05)

But prior adjudication of identical claims is not sufficient to establish a collateral-estoppel defense. The Secretary also has the burden of establishing that Erard is in privity with the Socialist Party of Michigan. The Secretary has cited no case on point. (*See* Def.'s Mot. at 6.) In fact, the Secretary cites a case holding that a policeman's union was *not* in privity with one of its officers. (*See* Def.'s Mot. at 6 (citing *Sloan v. City of Madison Heights*, 425 Mich. 288, 389 N.W.2d 418, 422 (1986)).) Because the Court does not have the benefit of Michigan precedent on the issue of whether a member and nominee of, and a potential voter for, a political party is in privity with the party for purposes of ballot access, the Court will address the merits of all of Erard's claims, including that the Socialist Party is eligible for the ballot pursuant to § 168.560a. The Court turns to that claim now.

## B.

Erard claims that the Socialist Party of Michigan has satisfied the following standard:

> A political party the principal candidate of which received at the last preceding general election a vote equal to or more than 1% of the total number of votes cast for the successful candidate for secretary of state at the last preceding election in which a secretary of state was elected is qualified to have its name, party vignette, and candidates listed on the next general election ballot.

Mich. Comp. Laws § 168.560a; *see also* (Am. Compl. ¶¶ 166, 178, 200-05.) Prior to the November 2012 general election, Erard explains, the Socialist Party nominated Dwain Reynolds for one of Michigan's Board of Education seats. (Am. Compl. ¶ 75 n.87, ¶ 82 & n. 93.) Soon after the Socialist Party's nomination, the Green Party of Michigan also nominated Reynolds for the same office. (Am.

24

Compl. ¶ 82 & n. 93.) Reynolds, however, never specified to the Secretary which party he wanted to represent. (Am. Compl. ¶ 84, n.95.) Then, at the November 2012 election, Reynolds received 66,123 votes—many more votes than required for requalification under § 168.560a. (*See* Am. Compl. ¶ 75 n.87.) Thus, says Erard, Reynold's votes qualify the Socialist Party for Michigan's November 2014 general-election ballot. Erard claims that, by failing to recognize this fact, the Secretary is violating the Fourteenth Amendment of the U.S. Constitution, the Purity of Elections Clause of the Michigan's Constitution, and Michigan statutory law. (*See* Am. Compl. ¶¶ 166, 178, 200-05.)

Erard's theory is not plausible for one reason: Reynolds appeared on the November 2012 general-election ballot under the Green Party label. (*See* Am. Compl. ¶ 86 n. 98.) Indeed, the Socialist Party has not appeared on Michigan's general-election ballot since 1976 (when the Party was named the Human Rights Party). (Am. Compl. ¶¶ 56-58.)

Erard's efforts to avoid this dispositive fact are unavailing. First he pleads that Reynolds was listed as a Green Party candidate because the Secretary violated Michigan law. (Am. Compl. ¶ 86.) In particular, he alleges that, contrary to Michigan Compiled Laws § 168.692, Reynolds did not receive any "request for advisement from Defendant" as to which party he wanted to be affiliated with on the November 2012 ballot. (Am. Compl. ¶ 84 & n.95.) And, says Erard, under Michigan Compiled Laws § 168.693(1), if a person is "certified as a candidate by more than 1 political party for the same office" and "fails to designate . . . the party column in which it is desired that his or her name be printed or placed on the ballots," the person's name "shall be printed or placed in the column of that party first making certification." Mich. Comp. Laws § 168.693(1).

Section 168.693(1), however, explicitly provides that the person's name shall be printed "in the column of that party first making certification." The regulation thus assumes that the party first making the certification, here, the Socialist Party, has a "column" on the ballot. But the Socialist Party did not qualify to place candidates on the November 2012 ballot and, therefore, had no column in which Reynolds could have been listed.

Erard has an another theory for why Reynolds' votes qualified the Socialist Party for the November 2014 ballot. (*See* Am. Compl. ¶¶ 200-03.) Prior to the 2002 amendments, "principal candidate" was defined as "the candidate whose name appears nearest the top of the party column." Mich. Comp. Laws § 168.685(6) (West 2001). After the 2002 amendments, the term "principal candidate" no longer references a "party column." Latching onto this change, Erard says that a "political party"—which is not defined in the statute—may have a "principal candidate" without having a "party column" on the prior ballot. (*See* Am. Compl. ¶ 203.) Because Reynolds was the Socialist Party's "principal candidate," the Socialist Party should be placed on the next general-election ballot pursuant to § 168.560a. (*See* Am. Compl. ¶ 203.)

The Court does not find this argument persuasive. First, prior to the 2002 amendments, for a party to requalify pursuant to § 168.560a, it had to appear on the prior ballot: this is inescapable given that "principal candidate" was then defined as the candidate at the top of the "party column." To accept Erard's claim that the legislature removed this requirement by removing the words "party column" from the statute would be to ignore a much more likely explanation for the omission: the term "party column" became surplusage once "principal candidate" was amended to be defined as the party's top vote-getter. Second, Erard's argument ignores the fact that § 168.560a has party-wide operation: if any candidate of a party receives 16,083 votes, then the entire party requalifies,

26

including the party's future nominees. This strongly suggests that the legislature contemplated some tie between the party name listed on the ballot and the candidate exceeding the threshold in § 168.560a. Third, undoubtedly some people voted for Reynolds not because of their preference for Reynolds personally or his association with the Socialist Party, but because he was listed as a Green Party candidate. Under Erard's theory, the Socialist Party should nonetheless benefit from these votes.

In short, the Amended Complaint does not make plausible that the Secretary violated constitutional or statutory law in failing to place the Socialist Party of Michigan on the general-election ballot because a Socialist Party nominee, who ultimately appeared on the ballot in another political party's column, received the votes required by Michigan Compiled Laws § 168.560a. It follows that Erard's derivative "Federal Elections Clauses" claim based on this theory also fails to state a claim upon which relief may be granted. (*See* Am. Compl. ¶ 212.)

## C.

Next, the Court considers Erard's claim that the Secretary has inconsistently applied the statutory language of § 168.560a and its related provision § 168.685(6). (Am. Compl. ¶¶ 173-74, 206.) Erard asserts that the Secretary "retroactively" applied the post-2002 definition of "principal candidate," i.e., the party's top vote-getter, to the votes cast for the Natural Law Party of Michigan and the U.S. Taxpayers Party of Michigan during the 2000 election to permit those two parties to requalify for the 2002 ballot via § 168.560a. (*See id.*) Erard says that the Secretary inequitably or erroneously has not done the same for the Socialist Party. (*See id.*) This theory does not state a claim upon which relief may be granted.

27

As the Secretary points out, the amendment to the principal candidate definition became effective on May 30, 2002. *See* Mich. Comp. Laws Ann. § 168.685(6) (West 2013). And § 168.560a refers to a political party's principal-candidate vote total during the "last preceding general election." At the time of the amendment, this would have been the 2000 election. Thus, the Secretary's application of the top-vote-getter standard to the year 2000 votes cast for the Natural Law Party and U.S. Taxpayers Party's candidates was not even "retroactive."

But even it was, unlike the Natural Law Party of Michigan and the U.S. Taxpayers Party of Michigan, the Socialist Party did not garner any votes in 2000. The last time it was on the ballot was 1976. The Court sees nothing inequitable about the Secretary "retroactively" applying the post-2002 principal-candidate standard to votes cast in the immediate preceding election as opposed to an election more than two decades earlier.

Erard's claim that the Secretary has inconsistently applied the statutory language of § 168.560a (and its related provision § 168.685(6)) to minor parties therefore fails to state a claim for relief. It follows that Erard's derivative "Federal Elections Clauses" claim that the Secretary has arbitrarily chosen the "cut-off point" for "retroactive" application of the post-2002 definition of "principal candidate" also does not state a claim for relief. (*See* Am. Compl. ¶ 213.)

**D.**

The Court now turns to Erard's claim based on the First Amendment. (Am. Compl. ¶¶ 184-98.) For reasons detailed below, the Court concludes that when the non-conclusory allegations in the Amended Complaint are accepted as fact, and reasonable inferences are drawn from those allegations in favor of Erard, it is plausible that Michigan has made it impermissibly difficult for the Socialist Party of Michigan to qualify for the general-election ballot by petition. As Erard seeks placement on Michigan's ballot as a Socialist Party candidate, and wants to vote for other Socialist Party candidates, it follows that these obstacles plausibly impose severe burdens on Erard's First Amendment rights.

**1.**

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) the Supreme Court set forth the framework for analyzing a claim that a state's election laws impermissibly burden the First and Fourteenth Amendment rights of a political party, its candidates, or its supporters.

Ballot-access regulations burden two different but "overlapping" constitutional rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968). Restrictive ballot-access laws burden the right to associate because voters may view a political party that cannot qualify for the ballot as an "[in]effective device for advancing the ideas or political aspirations of its adherents." *Socialist Workers Party v. Sec'y of State*, 412 Mich. 571, 588, 317 N.W.2d 1, 6 (1982). And restrictive ballot-access requirements burden voting

rights because "[v]oters, faced with statutorily limited ballot choices, may find exercise of the right to vote a Hobson's choice and not an expression of political preference." *Id.*

Still, the states may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and the Supreme Court "has recognized that States retain the power to regulate their own elections," *Burdick*, 504 U.S. at 433. Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Thus, not every ballot-access regulation is subject to strict scrutiny. *Burdick*, 504 U.S. at 433. Instead, "a more flexible standard applies." *Burdick*, 504 U.S. at 433 (citing *Anderson*, 460 U.S. at 788-89 and 460 U.S. at 808, 817 (Rehnquist, J., dissenting)). This Court must weigh "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789; *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 213-14 (1986)). In performing this balancing test, "the rigorousness of [this Court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* If the ballot-access scheme places "severe" burdens on the right to associate and vote, the Constitution demands that the state's regulations be "'narrowly drawn'" to advance

a state interest of "'compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (citing *Anderson*, 460 U.S. at 788; *id.* at 788-89, n. 9).

There is "no bright line separating severe from lesser burdens." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring). "Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. Ultimately, there "is no substitute for the hard judgments that must be made," and "decision in this context, as in others, is very much a matter of degree." *Storer*, 415 U.S. at 730 (internal quotation marks omitted).

## 2.

Before turning to the intricacies of Michigan's ballot-access scheme, it is helpful to have a backdrop against which to judge its requirements. The Court therefore reviewed evaluations of other states' ballot-access schemes. As is to be expected, no court has considered the exact combination of requirements that minor political parties must now satisfy to reach Michigan's general-election ballot. *Cf. Hudler v. Austin*, 419 F. Supp. 1002 (E.D. Mich. 1976), *aff'd sub nom, Allen v. Austin*, 430 U.S. 924 (1977) (considering earlier version of Michigan's ballot-access scheme); *Socialist Workers Party v. Sec'y of State*, 412 Mich. 571, 317 N.W.2d 1 (1982) (same). Still, many decisions serve as helpful guideposts in determining whether Michigan's ballot-access scheme imposes severe

burdens on the First and Fourteenth Amendment rights of minor political parties.[3] The Court details

two of those here.

In *Jenness v. Fortson*, 403 U.S. 431 (1971), a nominee of the Socialist Workers Party (among

others) claimed that Georgia's ballot-access scheme violated his First Amendment rights and the

Equal Protection Clause. *Id.* at 432 n.3, 434. The Supreme Court disagreed. Georgia offered two

tracks to the ballot. An organization whose candidate received at least twenty percent of the most

recent vote for governor or president was deemed a "political party." *Id.* at 455. Political parties held

primaries, and the parties' primary winners appeared on the general-election ballot. *Id.*

Organizations not meeting the twenty-percent requirement were deemed "political bodies." *Id.* And

nominees of political bodies had to qualify for the ballot by submitting a petition "signed by at least

5% of the number of registered voters at the last general election for the office in question." *Id.* at

432. Political body candidates had 180 days to collect these signatures and had to submit them on

the same day in June that political parties held their primaries. *Id.* at 433-34. The Court also noted

that Georgia allowed write-in votes, a petitioning party did not have the "Procrustean requirement

of establishing elaborate primary election machinery," voters could sign a petition of more than one

party, voters could sign petitions and then vote in Georgia's primaries, and, relatedly, Georgia did

---

[3]*See generally*, *Storer v. Brown*, 415 U.S. 724, 740 (1974); *American Party of Texas v. White*, 415 U.S. 767 (1974); *Jenness v. Fortson*, 403 U.S. 431 (1971); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007); *Rogers v. Corbett*, 468 F.3d 188 (3d Cir. 2006); *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995); *Rainbow Coalition of Oklahoma v. Oklahoma State Election Board*, 844 F.2d 740 (10th Cir. 1988); *Hall v. Simcox*, 766 F.2d 1171, 1175 (7th Cir. 1985); *Libertarian Party of Florida v. Florida*, 710 F.2d 790 (11th Cir. 1983); *Green Party of Tennessee v. Hargett*, 882 F. Supp. 2d 959 (M.D. Tenn. 2012), *rev'd and remanded*, 700 F.3d 816 (6th Cir. 2012), *disposition on remand*, 2013 WL 3010697 (M.D. Tenn. June 18, 2013); *Citizens To Establish a Reform Party in Arkansas v. Priest*, 970 F. Supp. 690 (E.D. Ark. 1996); *Libertarian Party of Nevada v. Swackhamer*, 638 F. Supp. 565 (D. Nev. 1986).

not require petition signers to declare an intent to vote for the petitioning candidate. *Id.* at 438-39. In all, Georgia's scheme "in no way [froze] the status quo." *Id.* at 439. Accordingly, the scheme did not violate the First Amendment or the Equal Protection Clause. *Id.* at 439-42.

The amount of signatures Michigan demands, along with the time to collect those signatures and the deadline for submitting them, compares favorably to the petition scheme at issue in *Jenness*. A minor-party candidate in *Jenness* had to collect signatures equivalent to *five* percent of the number of *registered voters* for the office he sought. Michigan, however, requires a new political party to collect signatures equivalent to only *one* percent of those who *actually voted* for governor. Therefore, for any office elected by all of Georgia's voters (as opposed to, say, an office elected by a single congressional district), Georgia's signature requirement was markedly more onerous than Michigan's. Further, Georgia's scheme required the signatures to be collected in 188 days; Michigan provides a similar 180-day period.

*Libertarian Party of Florida v. Florida*, 710 F.2d 790 (11th Cir. 1983) is also instructive. There, the Eleventh Circuit considered the Libertarian Party's claim that Florida's petition scheme violated the First Amendment and the Equal Protection Clause. *Id.* at 792. Florida provided that a minor political party could place its candidates for statewide office on its general-election ballot only if the party submitted a petition "signed by 3% of the state's registered voters"; in 1982, this required 144,492 signatures. *Id.* at 792. Moreover, to place its candidates for local office on the ballot, the minor-party candidates had to submit an additional petition, this one "signed by 3% of the registered voters of the geographic entity represented by the office." *Id.* Examining Florida's scheme as a whole, the Eleventh Circuit concluded that the petitioning scheme was not unconstitutional. *See id.* at 793-94. The Court noted that those who voted in a primary could also

33

sign a petition, voters could sign more than one petition, there were no geographic distribution requirements (e.g., 200 signatures from each county), there was no upper limit on the number of signatures that could be submitted for validation (so parties could submit excess signatures to avoid falling short when some were invalidated), a party had 188 days to collect the signatures, the validation cost was only ten cents per signature validation cost, and, given that a minor political party had recently qualified for the general-election ballot, Florida's system did not "freeze the status quo." *Id.* at 794.

The ballot-access scheme at issue in *Libertarian Party of Florida* was, in significant ways, more burdensome on the First Amendment rights of minor parties than Michigan's. In Florida, a minor party had to collect signatures of *three* percent of the state's *registered voters* as compared to Michigan's *one* percent of those that *actually voted* for governor. The resulting disparity is considerable: 144,492 signatures in Florida, 32,261 in Michigan. And Michigan's petition route is in other ways similar to Florida's. In Michigan, although petitions are due prior to the primaries, voters may sign a petition and then vote in a primary, and Michigan has only a mild geographic distribution requirement (100 signatures from at least half of its fourteen congressional districts, *see* Mich. Comp. Laws § 168.685(1)), no cap on the number of signatures that may be submitted for verification, and, as noted, a 180-day collection period.

While this precedent is helpful, the Court recognizes that no precise comparisons can be made with the unique set of ballot-access requirements that Erard challenges in this case. *See Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982) ("In our view, it would appear that each case must be resolved on its own facts after due consideration is given to the practical effect of the election laws of a given state, viewed in their totality."); *McLaughlin v. N.*

34

*Carolina Bd. of Elections*, 65 F.3d 1215, 1223 (4th Cir. 1995) ("We cannot dispose of this issue, however, simply by noting that schemes with similar [ballot qualification and requalification] tiers have been uniformly upheld."). Thus, this Court must determine whether "the totality" of Michigan's requirements for ballot-access imposes an unconstitutional burden on voting and associational rights. *See McLaughlin*, 65 F.3d at 1223; *Libertarian Party of Ohio*, 462 F.3d at 592-93 (explaining that it would be erroneous to analyze "the burdens imposed by the challenged [ballot-access] statutes separately, rather than addressing their collective impact").

### 3.

The Court will examine each aspect of Michigan's ballot-access scheme that, according to Erard, adds to the challenge of satisfying the signature requirement of Michigan Compiled Laws § 168.685(1), and then determine whether, as whole, Michigan's petition route to the general-election ballot imposes a severe burden on Erard's First Amendment rights. *See Libertarian Party of Ohio*, 462 F.3d at 586 ("The first step under the *Anderson/Burdick* framework is to determine whether this burden on the associational rights of political parties is 'severe.'").

### a.

The core requirement of § 168.685 is collecting signatures equivalent to one-percent of the last vote for governor; based on the November 2010 gubernatorial election, this equates to 32,261 signatures for the November 2014 general election. This demand, whether measured by percent or number, is well below the quantity that would, by itself, constitute a severe burden on the First Amendment rights of a political party seeking ballot access. *See Jenness*, 403 U.S. at 432, 439-40; *Libertarian Party of Florida*, 710 F.2d at 792-94; *Hall v. Simcox*, 766 F.2d 1171, 1175 (7th Cir. 1985) ("In general the danger zone does not even begin until a state goes above 2 percent . . . .

35

Professor Tribe has suggested that the danger zone does not begin till the requirement goes above 5 percent."); *Green Party of Tennessee v. Hargett*, 700 F.3d 816, 824 (6th Cir. 2012) (holding that Tennessee's requirement that a minor party collect signatures equivalent to 2.5% of the prior vote for governor, which equated to over 40,000 signatures, was not unconstitutional on its face).

This precedent notwithstanding, Erard pleads, "[i]n light of the Supreme Court's finding [in *American Party of Texas v. White*, 415 U.S. 767 (1974)] that 22,000 signatures was at the outer limit of support that the State of Texas could require before according a political party placement on the ballot, Michigan's outer limit should be substantially lower than 22,000 signatures." (Am. Compl. ¶ 189; *see also* Pl.'s Resp. at 16.) In support of this claim, Erard relies on the following interpretation of the Supreme Court's statement in *American Party of Texas*:

> In [previously[4]] evaluating Tennessee's 2.5% signature requirement, this Court looked beyond the mere percentages in the state statutes cited in the Supreme Court decisions on this issue. The Court again deems probative that in *American Party of Texas*, the Supreme Court ruled: "The District Court recognized that any fixed percentage requirement is necessarily arbitrary, but *we agree with it that the required measure of support—1% of the vote for governor in the last general election and in this instance 22,000 signatures—falls within the outer boundaries of support the State may require before according political parties ballot position.*" *Id.* at 783, 94 S.Ct. 1296 (emphasis added). As in *American Party of Texas*, this Court focused on the 22,000 signatures of registered voters as the outer boundaries of the modicum of support required under the Constitution. . . .
>
> Tennessee's voter signature requirement for party recognition far exceeds the outer limit of 22,000 signatures set in *American Party of*

---

[4]In *Green Party of Tennessee v. Hargett*, 882 F. Supp. 2d 959, 1005-10 (M.D. Tenn. 2012) the district court held several provisions of Tennessee's petitioning scheme unconstitutional, including its requirement that a party collect 2.5% of the votes in the last gubernatorial election which equated to 40,039 valid signatures of registered voters. On appeal, the Sixth Circuit remanded the case because Tennessee had amended its ballot-access scheme since the district court's decision. *See generally Green Party of Tennessee v. Hargett*, 700 F.3d 816 (6th Cir. 2012).

> *Texas* and the 25,000 signature limits in [*Norman v. Reed*, 502 U.S. 279, 295, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)] and [*MacDougall v. Green*, 335 U.S. 281, 283-84, 69 S.Ct. 1, 93 L.Ed. 3 (1948)]. Given the significantly higher 2 million voters in Texas, the Court again concludes that Tennessee's outer limit should be significantly less than 22,000.

*Green Party of Tennessee v. Hargett*, No. 3:11-00692, 2013 WL 3010697, at *33-34 (M.D. Tenn. June 18, 2013).

This Court does not place the same import on the 22,000 number from *American Party of Texas*. To be sure, as the signature quantity goes up, the more resources a political party must expend to collect them. *See Hall*, 766 F.2d at 1174 ("[I]t costs money to circulate petitions; the more signatures that are required, the higher the cost is; and minor parties usually are strapped for funds."). Still, the Supreme Court in *American Party of Texas* may well have been referring to Texas' percentage rather than, as Erard reads the statement, the absolute quantity. *See id.* ("Of course in one sense the more populous the state, the easier it is to get signatures—there is a larger pool to fish from."). But whichever the Court was referring to, and perhaps even both, it merely stated that "1% of the vote for governor at the last general election and in this instance 22,000 signatures" fell "within the outer boundaries." *Am. Party of Texas*, 415 U.S. at 783. It did not say that 22,000 "was the outer boundary." And the cases cited above, decided after *American Party of Texas*, support this reading of the Supreme Court's statement.

In short, the Court believes that collecting signatures equivalent to one-percent of the last vote for governor, presently 32,261 signatures, is well short of imposing a severe burden on First Amendment rights of a political party seeking ballot access.

**b.**

Erard also says that Michigan's requirement that a minor party collect 32,261 signatures within 180 days is a substantial hurdle. Noting that the 180-day period is bounded on the early side by when voters become interested in an election, *see Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006), and on the late side by Michigan's 110-day pre-election deadline, Erard concludes that any meaningful signature collection must take place during Michigan's winter months. (Am. Compl. ¶¶ 113-14 & n.140.) Erard also says that Michigan prohibits circulation of petitions in "supermalls" and "large shopping centers." (*See* Am. Compl. ¶¶ 111, 113.) Further, the 180-day period is allegedly so short that it "precludes any reasonable possibility for a 'new' political party" to obtain "ballot qualification through the committed efforts of *volunteer* petition circulators alone." (Am. Compl. ¶ 50.)

Although these concerns are not trivial, the time Michigan allows for signature collection does not impose a significant burden on minor parties seeking to petition their way onto Michigan's ballot. First, as will be discussed in greater detail below, a number of minor parties have satisfied Michigan's signature demand within the time allowed and despite Michigan's weather. Second, both *Jenness* and *Libertarian Party of Florida* upheld schemes that required collecting *multiples* of Michigan's signature demand in virtually the same amount of time that Michigan provides (and there is no indication that the milder (southern) weather played a role in those Courts' decisions). And *Storer v. Brown*, 415 U.S. 724 (1974) almost ends the time-to-collect inquiry. There, California law required an independent presidential candidate to collect in the neighborhood of 325,000 signatures from California voters within a 24 day period to qualify for the ballot. *See id.* at 727, 738-39. The Supreme Court reasoned: "Standing alone, gathering 325,000 signatures in 24 days would

38

not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President." *Id.* at 740. If collecting 13,542 signatures per day is not a severe burden, the Court is hard pressed to say that Michigan's demand for 180 per day moves the needle in that direction very far—even when Michigan's weather and proscribed locations are accounted for.

**c.**

"[A] historical record of parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality." *See Libertarian Party of Ohio*, 462 F.3d at 589-90. Erard implies that Michigan has a history of minor parties failing to complete Michigan's petition route. (Am. Compl. ¶¶ 20-22, 187.) He first points out that in every election from 1954 through 2000 (except one) at least one minor political party satisfied the signature requirement. (Am. Compl. ¶ 20.) Since then, Erard says, no minor party has met the standard. (Am. Compl. ¶ 21.) Erard therefore implies that Michigan's petition scheme has, in recent elections, proven itself to be unduly burdensome.

The Court reads Michigan's record of minor-party qualification differently. Since 1996, five minor parties—U.S. Taxpayers, Green, Natural Law, Socialist Equality, and Reform—have qualified for Michigan's ballot via the petition route, including two as recently as the 2000 election. *Performance of Minor Parties in Michigan General Elections* at 2. Each of these five parties met the § 168.685(1) one-percent standard after the legislature changed the base from secretary-of-state votes to gubernatorial votes. In fact, each of these parties had to collect over 30,000 signatures to meet the one-percent threshold of § 168.685(1). *Performance of Minor Parties in Michigan General*

39

*Elections* at 2. This is effectively the same number of signatures that the Socialist Party must now collect.

And the drop-off in minor parties collecting the requisite signatures beginning in 2002 has a ready explanation: each of the last five parties that have satisfied § 168.685(1) have since been able to forgo the petition route because they have been able to requalify under § 168.560a, the requirements for which were relaxed in 2002.[5] Erard acknowledges this fact: "every ballot-qualified minor party's 'principal' (i.e. highest vote-totaling) candidate widely surpassed the minimum vote threshold needed to ensure his or her party's continued ballot access retention within each of the six general elections held since the enactment of 2002 P.A. 399." (Am. Compl. ¶ 37.)

In short, the Court believes that Michigan's record of minor party qualification favors finding its petition scheme to be reasonable.

### d.

Erard further claims that Michigan's signature-collection requirement burdens his First Amendment rights because the Socialist Party cannot qualify candidates for office in a particular district, county, or city, even if it has strong support in those locales, unless it also has the statewide support demanded by § 168.685(1). (*See* Am. Compl. ¶¶ 50, 128, 185, 193.) "The only path to qualification (at least the only path recognized by Defendant) is a prohibitively expensive statewide petition. The State bars 'new' parties from qualifying at the local level, participating in primaries, or even qualifying a candidate to run for election with its party label in any single race." (Am. Compl. ¶ 50.)

---

[5] Only four minor parties now appear on Michigan's ballot because the Reform Party of Michigan failed to certify a candidate in the 2004 election. (Am. Compl. ¶ 22 n.34.)

This argument is not without persuasive force. Take, for example, the office Erard seeks: a seat in the United States House of Representatives. Michigan has 14 congressional districts with roughly the same population, and, for the purposes of argument, roughly the same voter turnout. So if Michigan were to tailor its one-percent requirement to the office sought, Erard might only need one-fourteenth of the signatures that the Socialist Party must now collect to field him for the House of Representatives. In fact, Erard pleads that an independent candidate for Congress need only obtain 3,000 signatures from his or her district to gain placement on the ballot. (Am. Compl. ¶ 135 (citing Mich. Comp. Laws §§ 168.544f; 168.590b(3)).) And although the Secretary relies heavily on *Jenness*, it is notable that Georgia applied its five-percent requirement to the pool of registered voters for the office sought. As articulated by the Fourth Circuit, Erard has raised a valid concern:

> When the ballot access provision here at issue is assessed in light of the totality of North Carolina's election laws, a serious problem is raised that has to be addressed. In one potentially significant respect, the North Carolina ballot access regime is distinguishable from, and more restrictive than, the Georgia system that the Supreme Court upheld in *Jenness* . . . . Specifically, North Carolina provides no means by which a small party can nominate a candidate for any office in the state unless it secures the petition support of 2% of the persons who voted in the previous gubernatorial election. That means, for instance, that the Libertarian Party cannot nominate candidates even in the four legislative districts where Libertarian candidates polled more than 10% of the total vote cast at the 1992 election without first meeting the requirements to qualify as a statewide party.

*McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1223 (4th Cir. 1995) (ultimately concluding that "[a]lthough the challenge is a serious one, we agree with the district court that the ballot access rules do not unconstitutionally burden rights guaranteed by the First and Fourteenth Amendments").

41

But Michigan's all-or-nothing scheme works the other way too. As to Michigan's statewide system, the Secretary only requires 100 signatures from each of half of Michigan's fourteen congressional districts while the remaining 31,500 signatures can come from the districts where a minor party has the most support. *See* Mich. Compl. Laws § 168.685(1). Thus, in the districts where Socialist Party nominees lack support, those nominees may make a ballot appearance because of the Socialist Party's statewide support. As to Michigan's party-wide system, if the Socialist Party has one popular candidate that attracts many signatures, other, less appealing candidates will benefit from those signatures. And Erard says that once a minor party qualifies for the ballot, it requalifies with ease; if so, this benefits all of the party's candidates, including those that garnered little or no support.

Given the foregoing, it appears that the essence of Erard's complaint about Michigan's statewide, party-wide qualification approach is that it is not well-tailored to test whether certain minor-party candidates have voter support that warrants ballot placement. As such, the Court will return to this argument after determining the level of scrutiny to be applied to Michigan's ballot-access scheme.

**e.**

Erard says that Michigan Compiled Laws § 168.685(1) "primarily test[s] a 'new' political party's ability to raise and expend large-scale financial resources." (Am. Compl. ¶ 188.) In support of this claim, Erard pleads that to collect the 32,261 signatures, a party needs the assistance of paid petition circulators. (Am. Compl. ¶ 43.) Although this allegation is conclusory, Erard cites a 2007 joint statement by the Socialist Party of Michigan and four other minor parties: "Under the present Michigan election law, it is impossible for a new party to nominate any candidates for the ballot

without spending tens of thousands of dollars on a statewide ballot access drive—an often impossible task for third parties which do not have the corporate financial backing of the two major parties." (Am. Compl. ¶ 43 (citing Michigan Third Parties Coalition, *Introduction* (2007), *archive available at* http://web.archive.org/web/20090611051329/mithirdparties.org/ (last visited Dec. 27, 2013)).) Erard additionally cites findings of an expert that testified in the *Hargett* litigation. (Am. Compl. ¶ 53.) That expert provided that "[t]he cost of signature collection by paid signature collection ranges from $1.50 to $2.00 per signature" and that "[a]s a general rule candidates and parties must collect 1.5–1.75 times the number of signatures required by statute." *Hargett*, 882 F. Supp. 2d at 978. Erard then applies these cost-per-signature and signature-quantity values to conclude that the cost of collecting 32,261 valid signatures would be in the range of $100,000. (Am. Compl. ¶ 53.)

The Court does not believe these allegations cover new ground. Michigan imposes no fees for attempting the petition route to its general-election ballot. *Cf. Bullock v. Carter*, 405 U.S. 134, 143-45 (1972) (applying strict scrutiny to Texas's requirement that candidates pay a filing fee to appear on the primary election ballot). The financial burden comes only from the cost of collecting signatures. True, one aspect of this cost is imposed by the Secretary: it is more costly to collect 32,000 signatures than 3,200. But if this is the basis for Erard's claim that Michigan's petition scheme imposes onerous monetary costs on a minor party, the claim is simply another way to say that 32,261 signatures is too many to collect. But, as discussed, courts have upheld demands for many more.

Other costs of collecting signatures are outside the Secretary's control. A party might run an advertising campaign to promote its petition drive. Or it may hire paid circulators to blanket the

state and ferret out supporters. But the return on these investments depends in significant part on the party's support among Michigan's electorate. All other things being equal, it is ten times easier to collect signatures when one out of ten voters supports the party than when only one out of hundred voters support the party. And that is precisely the point of a petitioning scheme: it helps determine whether a party has enough support in the community to warrant ballot placement.

Erard's allegations that Michigan's petition route to the ballot imposes undue financial burdens on petition parties would warrant separate consideration if he had pled that one party was able to qualify for the ballot based on its support in the community, but the Socialist Party, with the same or even more voter support, could not because it lacked the financial ability of the first. Erard, however, has pled no such facts. As such, the Court cannot find that Michigan's ballot-access scheme imposes an undue financial burden separate from the burden inherent in collecting 32,261 signatures.

**f.**

While none of the foregoing signature-collecting obstacles, even taken in combination, show that Michigan's ballot-access regulations severely burden Erard's First Amendment rights, Erard has identified two more restrictions that, in the manner pled, constitute substantial hurdles.

The first is Erard's claim that mandatory petition language discourages voters from signing the Socialist Party's ballot-access petitions because it implies to voters that, if they sign, they are making an indefinitely long, public commitment to form and organize the Socialist Party. (Am. Compl. ¶¶ 96, 98, 99 & n.122, 176-77, 190.) More specifically, Erard says that the mandatory title of a ballot-access petition—"PETITION TO FORM NEW POLITICAL PARTY"—implies to a voter that, if they sign the petition, they agree to help "form" the Socialist Party. (Am. Compl. ¶¶

44

96, 175 (quoting Mich. Comp. Laws § 168.685(3).) Erard also points out that petitions must include the following language (in large, bold type): "Warning: A person who knowingly signs petitions to organize more than 1 new state political party, signs a petition to organize a new state political party more than once, or signs a name other than his or her own is violating the provisions of the Michigan election law." Mich. Comp. Laws § 168.685(3), (4). Erard says that this statement implies to voters that, if they sign the petition, they are committing to help "organize" the Socialist Party. (Am. Compl. ¶¶ 175-76.) Erard adds that the language provides no "expiration time for or termination process of such association[s]." (Am. Compl. ¶ 175.)

On its face, Michigan's mandatory petition language does not impose a severe burden on collecting signatures. *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1226 (4th Cir. 1995) strongly supports this conclusion. North Carolina required, at the top of each page of a ballot-access petition, and "in bold print or all in capital letters," the following language: "'The undersigned registered voters . . . hereby petition for the formation of a new political party to be named _____ . . . . The signers of this petition intend to organize a new political party to participate in the next succeeding general election.'" *McLaughlin*, 65 F.3d at 1226 (capitalization altered). The Libertarian Party claimed that this language meant "that each petitioner will have to assume an active role in forming the Party beyond merely signing the petition." *Id.* The Court of Appeals agreed that this was a possible reading of North Carolina's mandatory petition language. *Id.* at 227. But it also thought that "[a] reasonable voter could well construe the language as a whole to mean only that the signers intend jointly—and not necessarily severally—to organize a political party that is 'new' in the narrowly relevant sense of not being presently qualified 'to participate in the next succeeding general election.'" *McLaughlin*, 65 F.3d at 1227. "So understood," said the Court, "the

45

language is not likely to deter a person otherwise interested in supporting a petitioning party from contributing her signature." *Id.*

This reasoning from *McLaughlin* applies squarely to Erard's facial challenge to § 168.685(3). Erard has emphasized only part of Michigan's mandatory petition language. But § 168.685(3) also requires petitions to say: "We, the undersigned, duly registered electors of the city . . . of _____ county of _____ state of Michigan, . . . respectfully request the secretary of state . . . to . . . *place the names of the candidates of the _____ party on the ballot at the _____ election*." Mich. Comp. Laws § 168.685(3) (emphasis added). Reading this language, together with the petition's title and warning language, "[a] reasonable voter could well construe" the petition to mean only that he or she supports forming or organizing a new political party to the extent of qualifying the party for Michigan's general-election ballot. *See McLaughlin*, 65 F.3d at 1227. As such, Erard has not adequately pled that Michigan's mandatory ballot-access petition language is unconstitutional on its face.

Notably, however, the *McLaughlin* court stressed that it did not have any *evidence* that would suggest the voters would construe the language in the manner suggested by the Libertarian Party. *See* 65 F.3d at 1227. Indeed, the court framed the question before it as whether it should—"[i]n the absence of any evidence"—"simply assume that the challenged language does hamper small parties' efforts to attract voters to sign their petitions." *Id.* Further, in deciding that it could not make such an assumption, the Court "reiterate[d] that the Libertarians did not proffer any evidence that the challenged aspects of the mandated petition language actually hampered their petition drive in even the slightest degree." *Id.* at 1227 n.12.

46

In contrast to the bare record before the *McLaughlin* court, Erard has pled facts suggesting that, as applied to him and the Socialist Party of Michigan, the mandatory petition language makes collecting signatures substantially more difficult. Specifically, he says:

> During both the [Socialist Party's] 2004 and 2011-12 ballot access petition drive[s] . . . volunteer circulators regularly experienced the occurrence of potential signers verbally expressing support for the effort, while nevertheless declining to sign [the circulator's] petitions over expressed concerns of possible subjection to state surveillance, blacklisting, harassment, employment repercussions, or other similar ramifications, *as a result of their publically documented (and formatively initiatory) association* with socialist or politically radical organizing.
>
> [I], for example, experienced frequently occurring refrain among potential signers of [the Socialist Party's] petitions upon the expressed basis of such concerns (i.e. in spite of simultaneously expressed personal support), even while conducting their [*sic*] circulation at the site of the fall 2011 "Occupy Detroit" political demonstrations and assemblies . . . . Moreover, when asked why such concerns did not also similarly inhibit their participation in the surrounding political protest events, such *signature-declining 'Occupy' participants typically expressed the presumption that signing the Socialist Party's petition (as requisitely worded) would pose a greater risk of causing them to become adversely labeled in association with politically radical involvement than would their own . . . very similarly politically-characterized, public protest events.*

(Am. Compl. ¶ 99 & n.122 (emphases added).)

The Court recognizes that these allegations are somewhat vague. For example, Erard does not define "regularly" or "frequently." Still, Erard has pled that when the Socialist Party attempted to solicit signatures, voters expressed concern about a public, "formatively initiatory" association with the Party; he has also pled that voters assumed that signing the Socialist Party's petition—"as requisitely worded"—would place them at substantial risk of being labeled as associated with "politically radical involvement." (*See* Am. Compl. ¶ 99 & n.122.) Drawing reasonable inferences

47

from these allegations in Erard's favor, Erard has pled facts that make it "plausible," *Iqbal*, 556 U.S. at 678, that the mandatory petition language set forth in § 168.685(3) has deterred a number of voters from signing the Socialist Party's ballot-access petition. The Court therefore concludes that Erard has adequately pled that § 168.685(3) is a substantial hurdle that the Socialist Party must clear to collect the signatures required by § 168.685(1).

**g.**

The Court also agrees with Erard that by restricting the pool of petition circulators to Michigan registered voters, Michigan has imposed a second significant barrier to satisfying the signature-collection requirement of § 168.685(1). (*See* Am. Compl. ¶¶ 144-45, 197.)

Michigan Compiled Laws § 168.544c(3) provides:

> At the time of circulation, the circulator of a petition shall be a registered elector of this state. At the time of executing the certificate of circulator, the circulator shall be registered in the city or township indicated in the certificate of circulator on the petition. . . .

In turn, to be a registered elector in Michigan, a person must be, among other things, "a resident of the state for not less than 30 days." Mich. Comp. Laws § 168.492.

A review of the case law reveals that this type of restriction has proven problematic. In *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999), proponents of an initiative claimed that Colorado's requirement that initiative petition circulators be registered to vote in Colorado violated "the First Amendment's freedom of speech guarantee." *Id.* at 188. The Supreme Court agreed. *See id.* at 193-95. Recalling that it had previously concluded that petition circulation is "core political speech" where First Amendment protection is "at its zenith," the Supreme Court reasoned that, by eliminating 400,000 eligible-but-unregistered voters from the pool of available

48

circulators, Colorado had unconstitutionally limited the number of voices who could convey the initiative proponents' message. *Id.* 186-87 (internal quotation marks omitted), 193-95.

Although *Buckley* involved initiative petitions and rested on the First Amendment's speech clause, in *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), the Seventh Circuit extended the reasoning of *Buckley* by holding that a registration prerequisite for circulating candidate petitions impermissibly burdened the candidates' First Amendment rights to association and ballot access. *Id.* at 860, 862. In *Krislov*, two primary-election candidates challenged Illinois' requirement that their petition circulators had to be registered to vote in the locale where they were seeking office: the entire state for the Senate candidate, one congressional district for the House of Representatives candidate. *Id.* at 856. Although both candidates were ultimately able to collect the signatures needed to appear on the ballot, the Court nonetheless held that Illinois' registration restriction substantially burdened several of the candidates' First Amendment rights:

> [Illinois' requirement that circulators be registered to vote in the subdivision the candidates seek to represent] places a substantial burden on the candidates' First Amendment rights by making it more difficult for the candidates to disseminate their political views, to choose the most effective means of conveying their message, to associate in a meaningful way with the prospective solicitors for the purposes of eliciting political change, to gain access to the ballot, and to utilize the endorsement of their candidacies which can be implicit in a solicitor's efforts to gather signatures on the candidates' behalf.

*Id.* at 862. The Court concluded that these burdens meant that Illinois' registration restriction should be examined with "exacting scrutiny." *Id.*

Other courts have found the reasoning of *Krislov* persuasive. In *Lerman v. Board of Elections in City of New York*, the Second Circuit held that New York's requirement that witnesses to petition signatures be residents of the same district as the candidate they sought to nominate severely

49

burdened not only protected speech, but also the right to political association. 232 F.3d 135, 139, 146 (2d Cir. 2000). Then, in *Nader v. Brewer*, the Ninth Circuit held that Arizona's residency requirement on petition circulators severely burdened an independent presidential candidate's First Amendment rights: "While the district court correctly observed that there remain millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support the candidate but who, like [Ralph] Nader himself, live outside the state of Arizona. Such a restriction creates a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights." 531 F.3d 1028, 1036 (9th Cir. 2008). The Sixth Circuit, although focused on the First Amendment's guarantee of free speech, reached a similar conclusion. *Nader v. Blackwell*, 545 F.3d 459, 478 (6th Cir. 2008) (holding that Ohio's imposition of voter-registration and residency requirements on Nader's petition circulators imposed a "severe restriction" on Nader's political speech and striking both requirements as unconstitutional). The Fourth Circuit, although also focused on speech rights, summarized the precedents in this area this way: "The triumvirate of 2008 decisions in [*Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008)], *Blackwell*, and *Brewer* demonstrate a general agreement among our sister circuits that residency restrictions bearing on petition circulators and witnesses burden First Amendment rights in a sufficiently severe fashion to merit the closest examination." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013); *but see Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) (holding that North Dakota's proscription on nonresident initiative-petition circulators was not unconstitutional).

Here, Erard pleads that, based on his research, Michigan is now the only state that restricts political parties to using in-state residents or registered voters to circulate its ballot-access petitions.

50

(Am. Compl. ¶ 144.) He further alleges that, based on the most recent U.S. Census data, Michigan's petition-circulator restrictions "exclude 97.5% of all voting-age United States citizens" from circulating the Socialist Party's ballot-access petitions. (Am. Compl. ¶ 145.)

The Court recognizes that Erard has not pled how many out-of-state circulators, if permitted, would be willing to circulate petitions on behalf of the Socialist Party in Michigan. But he has pled that the Socialist Party of the United States of America has branches in 20 other states and is "one of the only six minor political parties in the United States which has demonstrated sufficient national-level activity to qualify for Federal Election Commission-recognized status as a national political party." (Am. Compl. ¶ 16 (internal quotation marks and ellipses omitted).) Additionally, Erard has pled that in Ohio, a candidate of the Socialist Party of the United States of America recently obtained 26,454 votes toward becoming U.S. Senator (Am. Compl. ¶ 124); this suggests that the Socialist Party of Michigan may have willing circulators close by. Moreover, the Court believes that Erard does not have to say much about the availability of out-of-state circulators to state a claim for relief. As the Seventh Circuit put it:

> It is undoubtedly true that most people excluded from soliciting signatures would likely not be avid supporters [of Plaintiffs]. But this fact actually underscores the candidates' argument that the law severely burdens them. Candidates who do not have broad support must count on only a few supporters, and if they are not registered to vote or do not live in the district, the already small pool of volunteers will evaporate, thus greatly limiting the candidates' ability to disseminate their message and obtain the required signatures. . . . According to [Defendants'] argument, the law is not particularly restrictive because it might only prevent the candidates from using one or two solicitors. But for some minor candidates, parting with one or two avid circulators could significantly impact their campaigns.

*Krislov*, 226 F.3d at 862.

Accordingly, Erard has adequately pled that, by restricting circulators of political-party ballot-access petitions to voters registered in Michigan, *see* Mich. Comp. Laws § 168.544c(3), Michigan makes it substantially more difficult for the Socialist Party to collect the 32,261 signatures it needs to satisfy § 168.685(1).

**4.**

Having considered each of Michigan's ballot-access requirements that Erard has identified as onerous, the Court must now consider their combined effect and determine if Michigan's petition route to the ballot places a severe burden on Erard's First Amendment rights.

As noted, the Court does not believe that the Amended Complaint makes plausible that any of the following requirements—alone or in combination—severely burden the First Amendment rights of minor political parties (or their nominees or supporters) seeking to qualify for the general-election ballot by petition: (1) Michigan's requirement that petitioning political parties collect signatures equal to one-percent of the last vote for governor, which, for the November 2014 election, is 32,261 signatures; (2) Michigan's 180-day period to collect these signatures; and (3) Michigan's 110-day pre-election deadline to submit the collected signatures for verification. The Court further finds that Michigan's record of minor political parties qualifying to place candidates on the general-election ballot indicates that Michigan's petition route to the ballot is not too onerous.

On the other hand, taking the non-conclusory allegations in the Amended Complaint as true and drawing reasonable inferences from them in Erard's favor, it is "plausible," *Iqbal*, 556 U.S. at 678, that two of Michigan's requirements to successfully petition for the general-election ballot are substantial obstacles as applied to the Socialist Party of Michigan: the mandatory petition language

52

set forth in Michigan Compiled Laws § 168.685(3) and the restriction on petition circulators set forth in Michigan Compiled Laws § 168.544c(3).

Weighing all of these factors, the Court concludes that the Amended Complaint permits the reasonable inference that, as a whole, Michigan's requirements for political parties to qualify for the general-election ballot via petition impose a "severe" burden on the Socialist Party's right to qualify for Michigan's general-election ballot, which, in turn, imposes a "severe" burden on Erard's First Amendment rights to associate for the advancement of his political beliefs and to cast his vote effectively. This conclusion rests primarily on the fact that other courts have consistently held that state-residency or voter-registration restrictions on those who may circulate ballot-access petitions severely burden First Amendment rights—including the First Amendment rights of a candidate seeking to qualify for the ballot. *E.g.*, *Krislov*, 226 F.3d at 862.

The Secretary, although recognizing this Court's previously expressed concern (in the context of Erard's preliminary injunction motion) over Michigan's restrictions on petition circulators, nonetheless maintains that, as a whole, Michigan's petition route to the ballot does not severely burden Erard's First Amendment rights:

> Michigan Compiled Laws § 168.544c(3), which . . . requires petition circulators to be registered electors of the State, arguably imposes the most burdensome requirement on new parties attempting to obtain petition signatures. But, as this Court has previously opined, given the overall reasonableness of the relevant statutory scheme, it does not render § 685(1) violatory of Erard's right to associate or cast his vote effectively. ([Dkt.] 40, October 29, 2012 Opinion Adopting [R. & R. to Deny Pl.'s Mot. for Prelim. Inj.] at 19.)

(Def.'s Mot. at 12-13.)

It is true that in recommending that Erard's preliminary injunction motion be denied, this Court reasoned that § 168.544c(3) "appear[ed] to impose a significant burden on ballot-access," but

53

concluded that "[Erard] ha[d] not shown that Mich. Comp. Laws § 168.685(1) imposes a 'severe' burden on new political parties in their attempt to gain ballot access." (Dkt. 31, R. & R. to Deny Pl.'s Mot. for Prelim. Inj. at 20, 22.) But there, Erard had the burden of showing a likelihood of success on the merits; here, the Secretary has the burden of showing that Erard's First Amendment claim is implausible. Further, in its prior report and recommendation, this Court also expressed concern about Erard's delay in seeking preliminary relief.

This Court acknowledges, however, that in the preliminary injunction context it gave less weight to the burden imposed by § 168.544c(3) in determining the overall burden that Michigan's ballot-access scheme imposed on Erard's First Amendment rights. This was in part "because a declaration that Michigan unconstitutionally restricts who may circulate petitions would not remedy imminent, irreparable harm." (R. & R. to Deny Pl.'s Mot. for Prelim. Inj. at 16, n.4.) And to the extent that there is any inconsistency, this Court's current recommendation controls. (*See* Dkt. 31, R. & R. to Deny Pl.'s Mot. for Prelim. Inj. at 6 n.2 ("The Court's merits findings are only preliminary . . . .").)

The Secretary also says that "if this Court decides to strike down § 544(c), it would obviously not be considered in the [*Anderson-Burdick*] balancing test." (Def.'s Mot. at 13.)

This assertion is premature. Neither party has moved for summary judgment and so the Court has no procedural means to declare § 168.544c(3) unconstitutional. Instead, the question before the Court is whether any claim in the Amended Complaint is plausible such that Erard should be able to proceed to discovery on that claim. Additionally, there is no doubt that § 168.544c(3), because it restricts who may circulate petitions, is among the set of requirements with which a political party petitioning for placement on the general-election ballot must comply. Absent briefing on whether

54

§ 168.544c(3) is severable from the other petition requirements, the Court has no basis for now excluding it from the *Anderson-Burdick* calculus.

Accordingly, this Court concludes that the Amended Complaint permits the reasonable inference that Michigan's requirements for the Socialist Party to petition to qualify for the general-election ballot impose a "severe" burden on Erard's First Amendment rights.

Strict scrutiny therefore applies: "When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434).[6]

_____

[6]In *Rogers v. Corbett*, the Third Circuit reasoned that the tiers of scrutiny familiar to other types of constitutional adjudication did not fit into the *Anderson-Burdick* framework:

> Although we appreciate that the strict scrutiny, intermediate scrutiny, and rational basis categories represent a convenient and familiar linguistic device by which courts, including our Court, have characterized their review under *Anderson*, we note that *Anderson* promulgated a less categorical system of classification. [*See Burdick*, 504 U.S. at 434.] . . . Put another way, ballot access cases should not be pegged into the three aforementioned categories. Rather, following *Anderson*, our scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs' rights be burdened. Only after weighing these factors can we decide whether the challenged statute is unconstitutional.

468 F.3d 188, 194 (3d Cir. 2006).

In *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), Justice Souter, joined by Justice Ginsburg, similarly opined that under *Burdick*, the Supreme Court "[has] avoided pre-set levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue." *Id.* at 210. But Justice Scalia, joined by Justices Thomas and Alito, thought that *Burdick* established "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Id.* at 204. Justice Stevens, joined by Chief Justice Roberts and Justice Kennedy, arguably agreed more with Justice Souter's sliding-scale approach: "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to

**5.**

The Secretary asserts that "the State has a compelling interest in protection of the integrity of its election process and in preventing of the clogging of a state's election machinery and avoidance of voter confusion." (Def.'s Mot. at 14.) She further explains that "[u]nmanageable ballot lengths are particularly problematic under Michigan's consolidated elections regime, under which an increasing number of offices are elected at each election. In the 2012 general election, a significant number of Michigan's jurisdictions were forced to use 2-page ballots (2 pages front-and-back or 4 sides of a page)." (Def.'s Mot. at 12.)

Assuming that these are "compelling" interests, it at least plausible that Michigan has not used the least restrictive means to achieve these ends. In particular, the Secretary has not explained how the mandatory petition language regarding "form[ing]" and "organiz[ing]" a political party, Mich. Comp. Laws § 168.685(3), is narrowly tailored to avoid ballot clutter or voter confusion. And the same holds for Michigan's restrictions on who may circulate ballot-access petitions as set forth in § 168.544c(3). As the Seventh Circuit explained in *Krislov*:

> The Board asserts that . . . . the [requirement that circulators be registered to vote in the subdivision the candidates seek to represent] ensures that the candidates have a significant level of support in the community to merit ballot access so as to avoid confusion and deception. The Supreme Court has held that this is an important interest. . . . The problem here is that [the registration requirement] is not narrowly tailored to serve this interest. In fact, the law appears unnecessary, as the signature quota . . . already ensures that candidates have a minimum level of support.

---

justify the limitation.'" *Id.* at 191.

Even if the Court were to apply something other than "strict" scrutiny in this case, as will be discussed, it is at least plausible that the Secretary lacks sufficiently weighty interests to justify the burden imposed on Erard's constitutional rights. Accordingly, the Court need not now resolve this ambiguity in the *Anderson-Burdick* framework.

226 F.3d at 863; *see also Lerman*, 232 F.3d at 149-53 (holding that New York's witness residence requirement did not bear even a "rational relationship," let alone a narrowly tailored one, to interests of "(1) ensuring integrity and preventing fraud in the electoral process; (2) ensuring that candidates demonstrate a sufficient modicum of support before their name is included on the ballot; and (3) ensuring that non-residents may not impose the cost of a primary on the district" (internal quotation marks and alteration omitted)).

Because the foregoing suffices to conclude that Erard has plausibly shown that Michigan's ballot-access scheme is unconstitutional, the Court does not need to now address whether Michigan's party-wide, statewide method of ballot qualification is narrowly tailored to forward Michigan's interest in avoiding ballot clutter and ensuring viable candidates. *See Anderson*, 460 U.S. at 794-95 ("[T]he State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries."); *Libertarian Party of Florida*, 710 F.2d at 795 ("When candidates list a party affiliation . . . the voters and the state are entitled to some assurance that particular party designation has some meaning in terms of a 'statewide, ongoing organization with distinctive political character.'" (quoting *Storer v. Brown*, 415 U.S. 724, 745 (1974))). The Court can address this issue if and when the parties seek summary judgment.

* * *

In sum, accepting the non-conclusory allegations in the Amended Complaint as fact, and drawing reasonable inferences from those allegations in Erard's favor, it is plausible that, as applied to the Socialist Party of Michigan, Michigan's requirements for a minor political party to qualify for the general-election ballot by petition violates Erard's First Amendment rights.

57

The Court now turns to Erard's two remaining claims.

## E.

"Count 1" of the Amended Complaint asserts a violation of the "Fourteenth Amendment." (Am. Compl. at 76.) Although this is ambiguous given the Amendment's several dimensions, a footnote associated with Count 1 offers clarification. (Am. Compl. ¶ 161 n.196) It directs the Court to the following passage from the Supreme Court's decision in *Anderson*:

> In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. *We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment*. These cases, applying the "fundamental rights" strand of equal protection analysis, have identified the First and Fourteenth Amendment rights implicated by restrictions on the eligibility of voters and candidates, and have considered the degree to which the State's restrictions further legitimate state interests. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); [*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S. Ct. 983, 59 L. Ed. 2d 230 (1979)].

*Anderson*, 460 U.S. at 787 n.7 (emphasis added). And, in responding to the Secretary's motion, Erard directs the Court to another, related passage from *Anderson* (*see* Pl.'s Resp. to Def.'s Mot. at 18):

> A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties.

*Anderson*, 460 U.S. at 793-94; *see also* 460 U.S. at 788 (noting that a state's important interests in regulating elections are generally sufficient to justify reasonable, "nondiscriminatory restrictions").

58

In Count 1, therefore, Erard seeks to establish that strict scrutiny applies to Michigan's ballot-access scheme under the *Anderson-Burdick* framework because the scheme discriminates against those parties attempting to petition their way onto the ballot. (*See* Pl.'s Resp. at 18 ("In addition to schemes that impose severe burdens on associational rights, strict scrutiny must also be applied to challenged schemes whose restrictions are discriminatory.")); *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) ("The Supreme Court in *Anderson* explicitly imported the analysis used in equal protection cases to evaluate voting rights challenges brought under the First Amendment, . . . thus creating a single standard for evaluating challenges to voting restrictions.").

The heart of Erard's discrimination theory is that political parties seeking ballot access via petition, *see* Mich. Comp. Laws § 168.685, must demonstrate twice the voter support as those parties that are able to requalify for the ballot based on votes cast for their principal candidate in the prior election, *see* Mich. Comp. Laws § 168.650a. (Am. Compl. ¶¶ 160-62.) He pleads that this inequity is exacerbated by, among other things, Michigan's mandatory petition language which deters voters from signing petitions, and the 2002 amendment to the definition of "principal candidate" which made it easier for parties to requalify for the ballot via § 168.650a. (Am. Compl. ¶¶ 163, 175-77.)

As an initial matter, having alternate routes to the ballot is not inherently discriminatory. The Supreme Court said as much in *Jenness*: "Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." 403 U.S. at 441-42. Thus, the question is not simply whether Michigan requires petitioning political parties to perform different tasks from parties qualifying for the ballot via Michigan's two vote-

59

based routes. Instead, Erard must show discrimination "of some substance." *Am. Party of Texas*, 415 U.S. at 781.

Erard's allegations do not establish such discrimination. Erard compares the burden on the four minor parties now requalifying for the ballot via § 168.650a to its burden under § 168.685. This comparison, however, ignores the fact the four parties now requalifying via § 168.650a first complied with § 168.685 by collecting "the signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast for all candidates for governor at the last election in which a governor was elected." Moreover, at the time these four parties qualified for the ballot, one percent of the gubernatorial vote equated to over 30,000 signatures—an amount effectively the same as the 32,261 signatures the Socialist Party must collect to satisfy § 168.685. *See Performance of Minor Parties in Michigan General Elections* at 2. The Secretary has therefore not demanded that the Socialist Party do something to qualify for the ballot that those minor parties requalifying under § 168.650a did not have to do. Instead, the Secretary only asks that the Socialist Party do what those parties have already done. And should the Socialist Party satisfy § 168.685(1), it too will be the beneficiary of § 168.650a.

Erard counters with *Baird v. Davoren*, 346 F. Supp. 517 (D. Mass. 1972). In *Baird*, an independent candidate for the United States Senate claimed that Massachusetts' ballot-access scheme deprived him of equal protection of the laws. Like Michigan, Massachusetts provided three routes to its ballot. A party whose candidate for governor in the prior election received at least three percent of the vote for that office had the right to nominate candidates for the ballot; if a party fell short of that standard, it could still nominate candidates for the general election if its candidate for governor received at least one-tenth-of-one percent of the gubernatorial vote three elections in a row;

60

and, failing either of those, a party or an independent needed to collect signatures equal to three percent of the last vote for governor. *Id.* at 517-18. Thus, like Michigan's current scheme, Massachusetts also had a less onerous track for a party to stay on the ballot (receiving a nominal number of votes for three consecutive elections) than to qualify in the first instance (collecting signatures equal to three-percent of a gubernatorial vote).

But the inequality that the *Baird* court found impermissible stemmed from facts not here alleged. After Massachusetts created its signature-collection requirement—but before any party had to comply with it—the legislature amended the law to permit those minor parties that had polled at least a tenth of a percent in the last three gubernatorial elections to remain on the ballot. 346 F. Supp. at 518. In other words, Massachusetts' statutory scheme essentially gave those minor political parties that had been on the ballot at the time the signature requirement was enacted a free pass from complying with the new standard. *See id.* At the same time, Massachusetts law required all other minor parties (including those to be formed in the future) to collect the signatures. *See id.* Thus, "the discrimination challenged [in *Baird*] arose from an attempt to mitigate standards of general application for the benefit of certain parties in existence at the time of the general electoral reform." *Id.* at 520.

Erard has not pled comparable facts. As far as this Court can tell, every minor party that has ever benefitted from § 168.560a first complied with some version of the signature requirement set forth in § 168.685(1). *See Performance of Minor Parties in Michigan General Elections* at 2. And although the signature requirement became more demanding after the 1988 change from secretary-of-state vote to gubernatorial vote, each of the four minor political parties that have requalified for Michigan's November 2014 ballot via § 168.560a first satisfied the post-1988 standard. *Id.* And, as

noted, each of these parties collected over 30,000 signatures. *Performance of Minor Parties in Michigan General Elections* at 2.

In apparent acknowledgment of this fact, Erard maintains that there are now more hurdles to clear than when other minor parties satisfied § 168.685(1). Erard points out that since the 1980 general election, the signature requirement has increased "by 13,992 signatures (i.e., +76%)." (Am. Compl. ¶ 33.) But more relevant is that, since 1996, the signature requirement has been greater than 30,000 and five different minor parties have collected at least that number of signatures. *Performance of Minor Parties in Michigan General Elections* at 2.[7]

Erard also points to two changes in the Michigan Campaign Finance Act that occurred after other minor parties met the standards of § 168.685(1): "a 'new' political party attempting to qualify for the Michigan ballot has now become prohibited from accepting [1] anonymous or confidential contributions toward its ballot-qualifying expenses, or [2] any [contributions] for that purpose from any labor organization, business entity, casino interest holder, or American Indian tribe." (Am. Compl. ¶ 44; *see also* Am. Compl. ¶¶ 45-48.)

These allegations are not sufficient to show that the Socialist Party's signature-collection task is significantly more onerous than the one minor parties faced prior to the recent amendments to the Michigan Campaign Finance Act. It is true that Erard has pled that the minor parties now on the ballot spent thousands of dollars on their petition drives. (Am. Compl. ¶ 21 n.32 (providing that Libertarian Party collected requisite signatures "at a cost of over $30,000, in addition to thousands

---

[7]The Secretary says that, in 2010, a sixth party, the Tea Party, met the standard by collecting 59,000 signatures. (Def.'s Mot. at 11.) This claim is not apparent on the face of the Amended Complaint nor in the publicly available documents this Court has reviewed. So the Court ignores the Secretary's allegation for purposes of deciding her Rule 12(b)(6) motion.

of hours performed by hundreds of volunteers").) What is missing, however, is an allegation that a significant portion of that amount came from "a corporation, joint stock company, domestic dependent sovereign, or labor organization," Mich. Comp. Laws § 169.254(1), or anonymous sources. In other words, while Erard speculates that the new restrictions on petition-drive funding may, in theory, make the Socialist Party's upcoming signature-collection task more challenging than for those parties that successfully petitioned their way onto Michigan's ballot, the Amended Complaint does not contain enough factual matter permitting the reasonable inference that this, in fact, will be the case. *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) ("[A] plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." (quoting *Iqbal*, 556 U.S. at 678)).

Erard also cites *Libertarian Party of Illinois v. Illinois State Bd. of Elections*, No. 12 C 2511, 2012 WL 3880124 (N.D. Ill. Sept. 5, 2012) in support of his claim that Michigan's ballot-access scheme is unconstitutionally discriminatory. (Dkt. 54, Pl.'s Mot. to File Supp. Auth. at 1; Pl.'s Br. in Supp. of Mot. to File Supp. Auth. at 1.)[8] There, the Libertarian Party of Illinois (and a few of its supporters) asserted that an Illinois ballot-access law required new political parties "to field a complete list of candidates for all offices in the political subdivision in which it wishes to compete." *Id.* at *1. (For example, a new-political-party candidate for County Auditor would not appear on

---

[8]Erard cited this case for the first time after oral argument. (*See* Pl.'s Br. in Supp. of Mot. to File Supp. Auth. at 1.) The Court will grant in part and deny in part Erard's Motion to for Leave to File Supplemental Authority. The additional cases were submitted to the Court long after briefing on the Secretary's motion to dismiss had been complete, and Erard has not provided any explanation for why he first learned of them shortly before oral argument. Further, the timing of Erard's submission deprived the Court and the Secretary of the opportunity to review the cases before oral argument. In the interest of completeness, however, the Court has reviewed the three supplemental cases Erard identified as "especially relevant," including *Libertarian Party of Illinois*. (*See* Pl.'s Br. in Supp. of Mot. to File Supp. Auth. at 1 n.1.)

Illinois' ballots unless the candidate had "fellow party members . . . willing to contest the race for County Coroner, County Recorder, and every other vacant county position." *Id.* at *1, *6.) In denying the defendants' motion to dismiss the Libertarian Party's suit, the Court found it plausible that this "complete slate" requirement unconstitutionally favored established parties because established parties did not have to field a complete slate of candidates. *Id.* at *6. In so holding, the court found it important that the established parties and the new political parties were similarly situated in other material respects. *Id.* at *7. In particular, Illinois law provided that established parties were those that polled more than five percent of the entire vote cast in the applicable political subdivision whereas a new political party had to submit a petition signed by five percent of the entire vote cast in the applicable political subdivision. *Id.* at *1. Given that new political parties had to demonstrate the same modicum of support as established parties (albeit by different means) the court concluded that the established parties and the new political parties were similarly situated in terms of demonstrating a minimum level of support in the community. *Id.* at *7. Yet, Illinois law inequitably required new political parties to additionally comply with the "complete slate" requirement. *Id.*

Erard's discrimination theory does not show that Michigan's ballot-access scheme treats similarly-situated parties differently. The parties eligible to requalify for the ballot based on votes are different than the Socialist Party in a critical respect: they have complied with Michigan Compiled Laws § 168.685(1) by collecting over 30,000 signatures. The benefit that Erard believes is being inequitably conferred upon the minor parties requalifying via § 168.685(1) is because those minor parties have completed a task that the Socialist Party has not. Thus, unlike *Libertarian Party*

*of Illinois*, Michigan has not imposed disparate ballot-access requirements on parties that have demonstrated a similar modicum of voter support.

Finally, to the extent that Erard relies on the four equal-protection cases cited in the *Anderson* passage quoted at the outset of this section of this report and recommendation, each is different in material respects from this case.

In *Williams*, the Supreme Court held unconstitutional Ohio's ballot-access scheme that made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties." 393 U.S. at 25. The Court characterized the effect of Ohio's scheme as "not merely favor[ing] a 'two-party system'" but "favoring two particular parties—the Republicans and the Democrats—and in effect tend[ed] to give them a complete monopoly." *Id.* at 32. This, said the Court, was "invidious discrimination." *Id.* at 34. Again, the discrimination Erard complains of is different: as proven by the five minor parties that have collected over 30,000 signatures and successfully petitioned for ballot placement after the 1988 amendment to § 168.685, new political parties are able to qualify for Michigan's general election ballot. *See Performance of Minor Parties in Michigan General Elections* at 2.

*Bullock* and *Lubin* involved filing fees, which are not at issue here. In *Bullock*, the Court found that Texas' requirement that candidates pay substantial filing fees to appear on the primary-election ballot discriminated against candidates who were indigent. 405 U.S. at 149. The Court explained: "Many potential office seekers lacking both personal wealth and affluent backers are in every practical sense precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support." *Id.* at 144. Similarly, in *Lubin*, the Supreme Court held that California's requirement that candidates pay a

65

filing fee to obtain forms necessary for ballot access, even though the fee was more modest than those at issue in *Bullock*, was unconstitutional. 415 U.S. at 710, 715, 718. The Court reasoned, "Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests." *Id.* at 718. Notably, in both *Bullock* and *Lubin*, the Court found significant that a filing fee was an absolute prerequisite to the ballot access and neither Texas nor California provided signature collection as an alternative. *Bullock*, 405 U.S. at 137 ("There is no alternative procedure by which a potential candidate who is unable to pay the fee can get on the primary ballot by way of petitioning voters . . . ."); *Lubin*, 415 U.S. at 718 ("[W]e note that there are obvious and well-known means of testing the 'seriousness' of a candidacy which do not measure the probability of attracting significant voter support solely by the neutral fact of payment of a filing fee. States may, for example, . . . requir[e] [minor] parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election."). The reasoning of these cases thus forestalls Erard's attempt to extend their holding to the cost of collecting signatures. Although funding certainly would aid the Socialist Party's signature drive, with enough volunteers, the Socialist Party of Michigan can earn ballot access without spending significant funds. *Cf. Am. Party of Texas v. White*, 415 U.S. 767, 787 (1974) ("Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization.").

Lastly, the classification that warranted strict scrutiny in *Illinois State Board of Elections* is unlike the classification Erard complains of. In *Illinois State Board of Elections*, Illinois required "new political parties" that wanted to field candidates for *statewide* office to collect 25,000 signatures; incongruently, Illinois demanded new political parties seeking to field candidates for a

66

single *city* (Chicago) to collect 10,000 more signatures. 440 U.S. at 175-77, 184-85. The Court noted that Illinois had "advanced no reason, much less a compelling one, why the State need[ed] a more stringent requirement for Chicago." *Id.* at 186. Here, Michigan has not set two different standards for new political parties seeking to qualify for the ballot. Again, the classification Erard believes is discriminatory involves political parties that, on the one hand, have collected the requisite signatures and therefore may now requalify via § 168.650a and, on the other hand, those which have not collected the requisite signatures. *Illinois State Board of Elections* is therefore not controlling.

In sum, the Court finds implausible Erard's claim that Michigan's ballot-access scheme unconstitutionally discriminates against those political parties petitioning to access the ballot pursuant to Michigan Compiled Laws § 168.685 in favor of those political parties whose principal candidate received the requisite votes for requalification under Michigan Compiled Laws § 168.560a.

### F.

"Count 1" of the Amended Complaint also asserts a violation of the "Purity of Elections Clause" of the Michigan Constitution. (Am. Compl. at 76.) The allegations supporting this legal theory are the same, at least in all material respects, as those supporting Erard's claim that Michigan's ballot-access scheme is discriminatory. (*See* Am. Compl. ¶¶ 159-83.) More specifically, Erard asserts that Michigan has "disequilibrat[ed] the voter support threshold between 'new' political parties and automatic qualification-eligible parties" by requiring a new political party to demonstrate the support of "more than double the number of voters as a political party entitled to automatic ballot placement in order to appear on the same subsequent general election ballot." (Am. Compl. ¶ 160.) Erard says that this disparity, along with previously-discussed factors that allegedly

67

heighten this inequity, shows that "the Legislature has 'impart[ed] a substantial unfair advantage to political parties entitled to automatic general election ballot placement . . . . and thereby legislatively undermined . . . 'the goal of "equality of treatment" of parties and their candidates *seeking access* to the general election ballot in violation of the "purity of elections" clause, [Mich.] Const 1963, art 2, § 4.'" (Am. Compl. ¶ 160 (quoting *Socialist Workers Party v. Sec'y of State*, 412 Mich. 571, 598-99, 317 N.W.2d 1, 11 (1982).)

The Purity of Elections Clause of the Michigan Constitution states, "The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Mich. Const. 1963, art. 2, § 4. Although Michigan's Purity of Elections Clause is not coextensive with the Equal Protection Clause of the U.S. Constitution, *Jones v. Verbiest*, 836 F.2d 1348 (table) (6th Cir. 1988), the manner in which Erard invokes the Clause, including the cases he relies on, speaks almost exclusively of equal treatment. (*See* Am. Compl. ¶ 160 n.191; Pl.'s Resp. to Def.'s Mot. to Dismiss at 19.) Indeed, in one of the leading cases applying the constitutional provision, the Michigan Supreme Court explained: "Although the 'purity of elections' concept has been applied in different factual settings, it unmistakably requires . . . fairness and evenhandedness in the election laws of this state." *Socialist Workers Party*, 412 Mich. at 598, 317 N.W.2d; *see also Wells v. Kent Cnty. Bd. of Election Comm'rs*, 382 Mich. 112, 123, 168 N.W.2d 222, 227 (1969) ("The phrase, 'purity of elections,' is one of large dimensions. It has no single, precise meaning. The above cases demonstrate, however, that one of the primary goals of election procedures is to achieve equality of treatment for all candidates whose names appear upon the ballot."); *Coon v. Bureau of Elections*, No. 229884, 2002 WL 571695, at *3 (Mich. Ct. App. Apr. 16, 2002) ("Where a party

68

alleges unfair treatment on the basis of denial of access to the ballot, this Court will address the argument as implicating a [Purity of Elections Clause] issue.").

As stated, the Amended Complaint does not make plausible that Michigan's ballot-access scheme is unfair to the Socialist Party because it requires the Socialist Party to collect 32,261 signatures to petition its way onto Michigan's general-election ballot pursuant to Michigan Compiled Laws § 168.685 while simultaneously permitting other minor parties, who have already completed the same requirements of § 168.685 (and collected a substantially similar number of signatures), to requalify for the ballot via Michigan Compiled Laws § 168.560a. Accordingly, the Court finds that Erard's Purity of Elections Clause theory fails to state a claim upon which relief may be granted.

## IV.

"Ballot access cases do indeed require courts to make difficult judgments." *Green v. Mortham*, 989 F. Supp. 1451, 1462 (M.D. Fla. 1998), *aff'd*, 155 F.3d 1332 (11th Cir. 1998). Those difficult judgments have led this Court to RECOMMEND that the Secretary's Motion to Dismiss (Dkt. 46) be GRANTED IN PART AND DENIED IN PART. Accepting the non-conclusory allegations in the Amended Complaint as true, and drawing reasonable inferences from those allegations in favor of Erard, Erard has pled that Michigan's requirements governing ballot-access via petition, *see* Mich. Comp. Laws §§ 168.685, 168.544c, as applied to the Socialist Party of Michigan, impermissibly burden Erard's First Amendment rights to associate for the advancement

69

of political beliefs and to cast his vote effectively. None of Erard's other claims, however, are viable in the manner pled and, therefore, should be DISMISSED.[9]

Erard's Motion for Leave to File Supplemental Authority in Opposition to Defendant's Second Motion to Dismiss (Dkt. 54), is DENIED IN PART AND GRANTED IN PART. The Court has considered only the three cases Erard identified as most relevant. (*See* Pl.'s Br. in Supp. of Mot. to File Supp. Auth. at 1.)

## V.

The parties to this action may object to and seek review of this Report and Recommendation by the district judge within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is

---

[9]It appears that Erard's Amended Complaint does not allege that Michigan Compiled Laws § 168.544c (the petition circulator restriction) is unconstitutional on its face. To the extent that it does, given this Court's conclusion that § 168.544c imposes a significant burden as applied to the Socialist Party, the Court declines to address Erard's facial challenge. *See Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) ("Exercising judicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy. . . . As-applied challenges—the basic building blocks of constitutional adjudication—remain the preferred route." (internal quotation marks omitted)).

to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR

72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a

reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR

72.1(d)(3), (4).


s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  January 9, 2014


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on January 9, 2014.


s/Jane Johnson_____
Deputy Clerk

71