UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATT ERARD,

      Plaintiff,                      Case No. 12-cv-13627

v.                                HONORABLE STEPHEN J. MURPHY, III

MICHIGAN SECRETARY OF STATE
RUTH JOHNSON,

      Defendant.

_____/

**ORDER ADOPTING IN PART THE REPORT
AND RECOMMENDATION** (document no. 55)**, AND
GRANTING DEFENDANT'S MOTION TO DISMISS** (document no. 46)

Political parties seeking to appear on a Michigan ballot must either obtain a certain number of votes at the preceding general election or, if they fail to obtain enough votes, collect a certain number of signatures on a petition. The Socialist Party has not qualified for inclusion on Michigan's ballot through either method since 1976. Plaintiff Matt Erard, however, wants to run for Congress as a Socialist Party nominee and to vote for fellow nominees. Erard thus seeks a declaration that Michigan's ballot access law is unconstitutional and an injunction placing him and other Socialist Party candidates on the next general election ballot.

Michigan Secretary of State Ruth Johnson ("the Secretary") moves to dismiss. The magistrate judge[1] handling pretrial matters recommended dismissing all but one claim, namely that Michigan's ballot access requirements violate the First Amendment as applied to him. Both parties object to the magistrate's report and recommendation ("Report").

_____

[1] The magistrate judge that issued the report and recommendation has since been confirmed as a U.S. District Judge and a new magistrate judge has been assigned to the case.

Having reviewed the Report and the parties' objections, the Court will adopt the Report in part and grant the motion to dismiss.

**BACKGROUND**

Neither party objects to the magistrate's summary of the facts. The Court thus will summarize the facts briefly, modifying only the magistrate's description of Michigan election law.

I.    Statutory Background

Michigan provides two ways for a political party's nominee to appear on the general election ballot.[2] First, a political party may qualify for the general election ballot if the party's "principal candidate received at the last general election a vote equal to or more than 1% of the total number of votes cast for the *successful candidate for secretary of state* at the last preceding election in which a secretary of state was elected." Mich. Comp. Laws § 168.560a (emphasis added). For a party to qualify for the November 2014 ballot by this method, its principal candidate must have received at least 16,083 votes in the November 2012 election. Report 3.

A new or existing political party that cannot satisfy this criterion instead may qualify by submitting a petition with signatures of registered voters. *See* Mich. Comp. Laws § 168.685(1), (6). Prior to 1988, a political party needed signatures equal to 1% of the votes cast for the secretary of state in the preceding election in which a secretary of state was

---

[2] The magistrate erroneously concludes that there are three ways to qualify. In addition to the two ways described here, the magistrate writes that a party may obtain access by receiving a particular number of votes at a primary election. Report 2–3, ECF No. 55 (citing Mich. Comp. Laws §§ 168.531, 168.532). The statutes relied on by the magistrate describe a method for nominating candidates, not for ballot qualification. *See* Mich. Comp. Laws §§ 168.531 (describing nominations by direct vote at a primary election), 168.532 (describing nominations by caucus or convention).

elected. Report 4. Since 1988, however, a political party has been required to collect "signatures of registered and qualified electors equal to not less than 1% of the total number of votes cast for *all candidates for governor* at the last election in which a governor was elected." Mich. Comp. Laws § 168.685(1) (emphasis added). A party qualifying for the November 2014 election through this method must collect at least 32,261 signatures. Report 6.

A political party seeking qualification through this method must also comply with ancillary regulations. Among them, the political party must collect all signatures within 180 days preceding the filing of the petition. Mich. Comp. Laws § 168.685(1). And the political party must be in "substantially the following form":

PETITION TO FORM A NEW POLITICAL PARTY

We, the undersigned, duly registered electors of the city, township (strike one) of .......... county of .......... state of Michigan, residing at the places set opposite our names, respectfully request the secretary of state, in accordance with section 685 of the Michigan election law, 1954 PA 116, MCL 168.685, to receive the certificate and vignette accompanying this petition, and place the names of the candidates of the .......... party on the ballot at the .......... election

Warning: A person who knowingly signs petitions to organize more than 1 new state political party, signs a petition to organize a new state political party more than once, or signs a name other than his or her own is violating the provisions of the Michigan election law.

Mich. Comp. Laws § 168.685(3). The petition title and name of the political party must be in 24-point boldface type, the warning language must be in 12-point boldface type, and the remainder of the petition in 8-point type. Mich. Comp. Laws §§ 168.685(4), 168.544c(1).

Until recently, those circulating the petition also had to be registered voters in Michigan. Report 6 (citing Mich. Comp. Laws § 168.544c(3)). But a new law, which took effect on April 3, 2014, modifies this requirement. Three classes of people are now eligible

3

to circulate petitions to form a new political party: (1) registered Michigan voters; (2) individuals eligible to register as Michigan voters; and (3) non-residents who are 18 years of age, who are U.S. citizens, and who agree to be subject to Michigan's election laws with respect to the petition. Mich. Pub. Act 94 of 2014 § 544c(3)–(4), *available at* http://www.legislature.mi.gov/documents/2013-2014/publicact/pdf/2014-PA-0094.pdf.

Finally, a political party seeking ballot access is subject to other regulations that apply to all political parties. For example, political parties collecting more than $1,000 in contributions must disclose those contributions and their expenditures by filing a quarterly statement with the Bureau of Elections, which then releases the statement to the public. Report 7.

II.   Factual Background

The Socialist Party has both national and state branches. Report 8. Both aim to provide political representation to "segments of the State electorate who possess no financial assets to sell on the market other than their individual labor power." *Id.* (quoting Am. Comp. ¶ 51). Of the 250 Michigan residents who have joined the Socialist Party in the last eight years, most earn less than $20,000 per year. *Id.*

Since 1976, the Socialist Party has not qualified to appear on the Michigan's ballot. *Id.* at 1. The Socialist Party later attempted to regain ballot access by filing a lawsuit in state court several months before the November 2010 elections. *Id.* at 20. Among other things, the Socialist Party argued that Michigan's ballot access requirements on their face violated the First and Fourteenth Amendments by excessively burdening and unfairly disadvantaging minor parties. *Id.*; Br. in Support of Appeal, *Socialist Party of Michigan v.*

4

*Terri Lynn Land*, No. 10-867 (Sept. 10, 2010 Mich. Ct. App.). Both Michigan's trial and appellate courts rejected the Socialist Party's arguments. Report 20–22.

Erard — a longtime member of the Socialist Party, treasurer of the Socialist Party's "qualified party national committee," and Secretary of the Socialist Party of Michigan — led another effort to regain ballot access two years later. *Id.* at 8–9. After the Socialist Party nominated Erard for Congress in 2012, Erard circulated ballot access petitions on the Socialist Party's behalf. *Id.* He collected only 925 signatures out of the 32,261 signatures needed to gain ballot access. *Id.* at 9.

After his unsuccessful efforts to collect signatures, Erard filed this lawsuit. He seeks relief under six theories. First, he argues that Michigan's ballot access requirements unfairly disadvantage minor political parties, in violation of the Fourteenth Amendment and Michigan's Purity of Elections Clause. *Id.* at 10. Second, he argues that the requirements burden his associational rights, in violation of the First Amendment. *Id.* Third, he claims that the Secretary failed to acknowledge that the Socialist Party satisfied the statutory requirements for ballot access by winning sufficient votes in the November 2010 general election. *Id.* at 10–11. Fourth, Erard claims that the Secretary has used inconsistent definitions of "principal candidate" in determining whether a party has won enough votes to qualify for the general election ballot. *Id.* at 11. Fifth, Erard alleges that the Secretary violated Michigan law by filing to submit the Socialist Party's ballot access petition to the Board of State Canvassers in 2012. *Id.* Sixth, Erard argues that the alleged violations of Michigan law also entitle him to relief under the U.S. Constitution. *Id.*

5

**STANDARD OF REVIEW**

A district court must review timely and specific objections to a magistrate judge's report and recommendation de novo. *See* Fed. R. Civ. P. 72(b)(2), (b)(3). By contrast, the court may adopt, reject, or amend the portions of the report and recommendation to which no party properly objects. *See* Fed. R. Civ. P. 72(b)(3); *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

**DISCUSSION**

I.   Jurisdiction and Affirmative Defenses

The magistrate rejected most of the Secretary's jurisdictional arguments and affirmative defenses, finding only that one of Erard's statutory claims and a derivative constitutional claim are moot. Erard objects to this mootness finding. Additionally, the Secretary objects to the magistrate's analysis of her collateral estoppel defense. Neither objection has merit.

A.   Mootness

Although cases generally become moot "when the issues presented are no long 'live'" or the parties lose a "legally cognizable interest in the outcome," *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009), there is an exception for controversies "capable of repetition, yet evading review," *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006). The magistrate observes that most of Erard's challenges to Michigan's ballot access requirements fit this exception. Report 11–14. But relying on *Libertarian Party of Ohio*, the magistrate writes that Erard's claim that the Secretary failed to transmit the Socialist Party's petition for ballot access in 2012 to the Board of State Canvassers does not fit because

6

there are no allegations showing that the Secretary is likely to repeat the omission. *Id.* at 14.

Erard objects that *Libertarian Party of Ohio* permits dismissal on mootness grounds only if he contributed to the statutory violation. Pl.'s Objections 52–54, ECF No. 59. Erard simply misreads the decision. In *Libertarian Party of Ohio*, a Sixth Circuit panel dismissed a claim as moot because there was no "reasonable expectation or a demonstrated probability that the controversy" would recur. *Libertarian Party of Ohio*, 462 F.3d at 584. Fault played no role in the decision. The Court will thus dismiss as moot the claims based on the Secretary's alleged failure to transmit the petition.

### B.   Collateral Estoppel

The Secretary argues that collateral estoppel bars several of Erard's claims that are identical to those advanced in the Socialist Party's 2010 lawsuit in state court. The magistrate rejected this argument because it was unclear that the state courts disposed of the 2010 lawsuit on constitutional grounds and because Erard is not in privity with the Socialist Party. Report 20–24. The Secretary contests both conclusions. Def.'s Objections 2–10, ECF No. 57.

As the magistrate correctly observes, for collateral estoppel to apply, the Secretary must show both mutuality between the parties and that the same issue was actually litigated. Report 19 (citing *United States v. Dominquez*, 359 F.3d 839, 842 (6th Cir. 2004)). Although the Court is highly skeptical of the magistrate's conclusion that the state court lawsuit was not decided on constitutional grounds, there is no need to resolve that issue because the mutuality requirement is not satisfied.

Although Michigan takes a broad view of collateral estoppel, *Bates v. Twp. of Van Buren*, 459 F.3d 731, 734 (6th Cir. 2006), it maintains the traditional mutuality requirement, *Dominguez*, 359 F.3d at 843 (citing *Lichon v. American Universal Ins. Co.*, 435 Mich. 408 (1990)). Satisfying it requires showing that the party against whom preclusion is asserted had the same legal rights as the party to the prior litigation. *Baraga Co. v. State Tax Comm.*, 466 Mich. 264, 269–70 (2002). At minimum, this means that the parties must have "both a 'substantial identity of interests' and a 'working functional relationship' in which the interests of the nonparty [we]re presented and protected by the party in the litigation." *Adair v. State*, 470 Mich. 105, 122 (2004) (quoting *Baraga*, 466 Mich. at 269–70).

In arguing that the mutuality requirement is satisfied, the Secretary concedes much ground. The Secretary disclaims that Erard's membership in the Sociality Party, voting affinity, or candidate status satisfies the privity requirement. Def.'s Objections 8–9. Instead, the Secretary argues only that mutuality is satisfied based on the "official roles that he has held within the Party." *Id.* at 9. There are two difficulties with this argument. The first is that Erard is not suing in an official capacity, but is instead asserting rights interconnected with his desire to run for Congress and vote for Socialist Party candidates. The second difficulty is that the amended complaint does not reveal whether Erard had his official roles in the Socialist Party at the time of the prior lawsuit such that the requisite "working functional relationship" existed. *Adair*, 470 Mich. at 122 (quoting *Baraga*, 466 Mich. at 269–70). Therefore, the Court will not dismiss Erard's claims on collateral estoppel grounds.

II.   Statutory Claims

The magistrate also recommended dismissing Erard's remaining statutory claims: first, that the Secretary failed to recognize that a Socialist Party nominee obtained sufficient

8

votes at the 2012 general election to qualify the Socialist Party for the next ballot; and second, that the Secretary has applied inconsistent definitions of "principal candidate." Erard objects to the magistrate's recommendation, but his objections are meritless.

A.   Qualification at the 2012 Election

Erard argues that the Socialist Party qualifies for ballot access at the November 2014 elections because its "principal candidate" obtained "1% of the total votes cast for the successful candidate for secretary of state." Mich. Comp. Laws § 168.560a. Although it is undisputed that no candidate at the 2012 elections appeared under the Socialist Party label on the ballot, Erard alleges that the Socialist Party nominated Dawain Reynolds for the Board of Education. Report 24–25. Reynolds's name appeared on the ballot under the Green Party label. *Id.* But Erard claims that Reynolds counts as a Socialist Party candidate under Michigan law, because the Socialist Party nominated Reynolds before the Green Party and Reynolds never specified which party he wanted to represent. *Id.*

The magistrate rejected this argument for the simple reason that "Reynolds appeared on the November 2012 general-election ballot under the Green Party label." *Id.* Because Michigan's tradition of permitting a candidate to represent multiple parties and "principal candidate" is an undefined term, Erard objects that Michigan does not require a party's "principal candidate" to appear under its label on the ballot. Pl.'s Objections 44–50.

Although Michigan does not define "principal candidate" and permits multiple parties to nominate a candidate, Erard's argument neglects the structure of Michigan's ballot access requirements. Michigan provides two ways for a political party to appear on the ballot. Either the party must qualify under Section 168.560a by obtaining a sufficient number of votes at the preceding general election, or the party must qualify under Section

168.685 by obtaining a sufficient number of signatures on a petition. The first method, however, is only open to parties that appeared on the preceding general election ballot.

Section 168.685 makes this clear. If a political party's principal candidate receives "less than 1% of the total number of votes cast for the successful candidate for the office of secretary of state" at a general election, Section 168.685 specifies that the party's candidates will not appear on the next general election ballot. Mich. Comp. Laws § 168.685(6). Such a "disqualified party" must instead qualify for the ballot in the manner as a new political party. *See id.* And it is undisputed that a new political party may qualify only through the petition method. *See id.* § 168.685(1). The upshot is that the qualification method described in Section 168.560a is available only to parties that appeared on the preceding general election ballot, meaning that the Socialist Party could not qualify for ballot access by nominating a candidate appearing under another party's label.

Erard resists this conclusion. He posits that some political parties without ballot access, including the Socialist Party, are neither a new political party nor a disqualified party. Pl.'s Objections 50–51. This theory, however, conflicts with how Section 168.685 defines disqualified parties.[3]

B.    Definition of "Principal Candidate"

Erard also claims that the Secretary has employed different definitions of "principal candidate." Report. 27. After Michigan defined "principal candidate" in 2002 to refer to the candidate of the party receiving the most votes, the Secretary applied this definition to the

---

[3] In discussing Section 168.685, Erard states that Michigan may have changed its rules for determining whether a party should be disqualified from the ballot. Pl.'s Objections 51–52. Because he is merely speculating about facts not alleged in his complaint, the Court will not entertain the objection.

10

2000 election results to determine which parties should qualify for the 2002 ballot. *Id.* Erard thus argues that the Secretary acted inequitably by not applying this definition to the 1976 election results to determine if the Socialist Party qualified for the 2002 ballot. *Id.*

Because Michigan makes the "last preceding general election" the frame of reference for measuring a party's electoral success, the magistrate concluded that Erard's claim was meritless. Report 28 (quoting Mich. Comp. Laws § 168.560a). Erard responds by asserting that the Socialist Party is neither a new nor a disqualified political party. Pl.'s Objections 50–51. As already discussed, this reasoning conflicts with the plain language of the statute. Therefore, the Court will dismiss Erard's remaining statutory claims.

III.   Federal Constitutional Claims

Erard alleges that Michigan's ballot access requirements burden his First and Fourteenth Amendment rights. The magistrate, however, recommends granting only Erard's claim that Michigan's ballot access laws violate his First Amendment rights as applied to him. Both parties object to this recommendation.

A.   *Anderson-Burdick* Framework

The first category of objections concerns the appropriate standard for resolving Erard's constitutional claims. As the magistrate correctly stated, the *Anderson-Burdick* framework applies to both First and Fourteenth Amendment claims involving voting rights and ballot access. *See Obama for Am. v. Husted*, 697 F.3d 423, 429–31 (6th Cir. 2012); *Libertarian Party of Ohio*, 462 F.3d at 585–86. Under this framework, courts are to, first, weigh the "character and magnitude of the asserted injury" to the plaintiff's constitutional rights and, then, evaluate the "precise interests" that the state offers to justify the burden.

*Libertarian Party of Ohio*, 462 F.3d at 585 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

This test creates a sliding scale for evaluating voting regulations. A state's interests in regulating elections will generally justify "reasonable, nondiscriminatory restrictions" on the election process. *Id.* at 586 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). But state regulations severely burdening a person's voting and equal protection rights must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Burdick*, 504 U.S. at 434). Between these two extremes, however, there is no precise formula for evaluating the appropriate justification for an election regulation. *Obama for Am.*, 697 F.3d at 429. The analysis will vary with the case. *Id.*

But while accepting this general formula, the Secretary argues that the magistrate erred by stating that strict scrutiny applies to regulations that severely burden a person's First and Fourteenth Amendment rights. Def.'s Objections 16–17. The Court disagrees. Binding Sixth Circuit precedent equates the Supreme Court's description of the review that applies to regulations severely burdening a person's rights to strict scrutiny. *See Obama for Am.*, 697 F.3d at 429 ("[W]hen a state's classification 'severely' burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard."). And the Secretary identifies no subsequent decision that compels this Court to apply a different analysis. Therefore, the Court will apply strict scrutiny to regulations that severely burden Erard's rights.

B.      Equal Protection Theory

Turning to the substance of Erard's claims, the Court concurs with the magistrate that his equal protection challenge to Michigan's ballot-access requirements should be dismissed.

1.      Discrimination against New Parties

Erard principally argues that Michigan's ballot-access requirements facially and unconstitutionally discriminate between new and established parties by requiring new political parties to demonstrate roughly twice the voter support as established parties. Pl.'s Objections 1; Pl.'s Reply to Def.'s Resp. to Pl.'s Objections 2, ECF No. 66. This characterization of Michigan election law is incorrect for two reasons.

The first error concerns the amount of voter support new and established parties must show. Michigan law requires new parties to collect petition signatures equal to 1% of the votes cast for governor and established parties to receive votes equal to 1% of the votes case for secretary of state. Because the relative number of votes cast for the two offices may change from year to year, new parties do not necessarily have to meet a higher numerical threshold than established parties though this may often be the case. The 2010 election results show that the governor received substantially more votes than the secretary of state. But this single data point does not prove that new political parties must always collect twice as many signatures as established parties must collect votes. In evaluating the complaint, the Court thus cannot assign a precise ratio to the relative voter support new and established parties must show.

The second error is that Erard assumes new and established parties must show the same quality of voter support. The factual allegations in the complaint leave open the

question of whether collecting signatures is more onerous than convincing voters to cast their ballot for a party. Although the volunteer or financial cost of collecting signatures is undoubtedly high, the complaint does not compare these costs to the burden of convincing an individual to cast their ballot for a party's candidate. Nor does the complaint consider that voting for a party's candidate may be a stronger indicator of voter support than the act of signing a petition to have a party appear on the ballot. After all, the Michigan legislature might reasonably conclude that voting for a party's candidate demonstrates higher support than signing a petition because voting requires choosing one candidate over all others whereas signing a petition leaves the signer free to vote for another party's candidate.

Given these considerations, the Court cannot conclude that the ballot-access requirements on their face severely burden Erard's constitutional rights. The regulations certainly treat new and established parties differently. But having different routes to the ballot for differently situated political parties is not inherently invidious. The Supreme Court stated as much in *Jenness v. Fortson*, 403 U.S. 431 (1971). Faced with a Georgia statute that required nominees of political parties with 20% of the vote to seek ballot access through a primary election and that other candidates to obtain access by collecting signatures of 5% of voters, the Supreme Court held that Georgia did not "violate[] the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other." *Id.* at 440–41. The same can be said here.

Erard offers a litany of responses in response to this conclusion. He first argues that *Green Party of Michigan v. Land*, 541 F. Supp. 2d 912 (E.D. Mich. 2008), and *Williams v. Rhodes*, 393 U.S. 23 (1968), compel finding that Michigan structures elections in a manner

14

to favor established political parties. Both cases, however, are distinguishable. In *Green Party of Michigan*, the Court found that a law opening primaries only to parties with a 20% electoral showing favored major parties because no minor party had ever managed to meet that threshold. 541 F. Supp. 2d at 917–20. Similarly, in *Williams*, the Supreme Court invalidated an Ohio law that froze in place the status quo through a combination of nomination requirements, early filing deadlines, and organizational requirements. 939 U.S. at 30–35; *see also Jenness*, 403 U.S. at 438 (describing and distinguishing *Williams*). By contrast, the evidence here suggests that the structure of Michigan law does not give major parties a decided advantage. All litigants agree that several minor parties have qualified to appear on Michigan's ballot through the petition route.

*Storer v. Brown*, 415 U.S. 724 (1974)*,* and *American Party of Texas v. White*, 415 U.S. 767 (1974), are also inapposite. Although Erard characterizes these cases as about whether a state can assign different weights to petition signatures and votes, neither decision dealt with that question. Rather, *Storer* concerned whether candidates of small parties could reasonably be expected to collect a certain number of signatures given the other election regulations in place, 415 U.S. at 738–746, and *American Party of Texas* dealt with the constitutionality of ballot-access conditions, including the requirement that a small party demonstrate a certain level of voter support through nominating conventions or petitions, 415 U.S. at 776–86.

Additionally, Erard reasons that Michigan's ballot-access requirements must be discriminatory because the law was written under a system dominated by major parties. Pl.'s Objections 25. But just because major parties are in power does not mean that the existing election laws are discriminatory. Although ruling political parties presumably want

15

to maintain their hold on political offices, that does not relieve Erard of the responsibility to plead facts showing a constitutional violation. And there is no presumption of unconstitutionality for state election laws. *See Libertarian Party*, 462 F.3d at 585 ("[V]oting regulations are not automatically subjected to heightened scrutiny.").

Furthermore, Erard complains that Michigan discriminates against minor parties because established parties never had to circulate a petition to achieve ballot access. He explains that when Michigan instituted the two-route system now in place it never required established parties to circulate a petition. Whether this is true or not, the Court cannot say. Erard neither alleges this fact in his complaint nor identifies supporting records of which the Court can take judicial notice. Therefore, the Court will not consider the objection.

Finally, Erard argues that the Secretary fails to justify its election law under even rational basis review. The Secretary, however, explains that requiring new parties to demonstrate some measure of voter support is necessary to avoid voter confusion, ballot overcrowding, and to protect the integrity of the election process. These are legitimate and important interests. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364–65 (1997); *Am. Party of Texas*, 415 U.S. at 781–82 & n.14; *Jenness*, 403 U.S. at 442. And a ballot-access threshold serves to promote them. *See Am. Party of Texas*, 415 U.S. at 782–83. Although Michigan might be able to promote these interests with a lesser threshold than currently imposed, courts have upheld far more stringent ballot-access requirements. *See, e.g.*, *Jenness*, 403 U.S. 431 (upholding a threshold of 5% of registered voters); *Libertarian Party of Florida v. Florida*, 710 F.2d 790 (11th Cir. 1983) (upholding a threshold of 3% of registered voters within the relevant geographic region). Erard's objection is thus without merit.

16

2.        Discrimination against the Socialist Party

Another theory Erard advances is that Michigan's ballot-access laws discriminate against the Socialist Party vis-a-vis other minor parties because ancillary voting regulations make it more difficult to gain ballot now than in past years. Pl.'s Objections 33–38. Erard explains that the four minor parties in Michigan qualifying to appear on the ballot between the years 1998 and 2000 did not face the same restrictions on campaign donations and the same disclosure requirements as the Socialist Party. *Id.* at 33–36. He adds that the four minor parties also had to collect approximately 2,000 fewer signatures to appear on the ballot. *Id.* at 36–39. The magistrate has already rejected these arguments, and the Court agrees that they lack merit.

By claiming that the Socialist Party is presently subject to more onerous restrictions than other minor parties were in the past, Erard overlooks that the signature requirement has been the same since 1988. Minor parties qualifying for ballot during the 1998 and 2000 election cycles were subject to the same qualification standard as the Socialist Party today. The only reason that new parties must now collect 2,000 or so more signatures is that the number of voters has increased. The fact, however, of this demographic change does not make the law discriminatory. After all, if the number of voters has increased, it is likely that the pool of eligible signers and potential Socialist Party supporters has as well. Furthermore, the only way to eliminate "discrimination" due to fluctuations in voter turnout would be to adopt a system that regulates ballot-access using fixed numerical thresholds. But the Constitution does not mandate that type of system. And the Supreme Court has upheld state voting laws that use percentages to regulate ballot-access. *See Am. Party of Texas*, 415 U.S. 767; *Jenness*, 403 U.S. 431.

17

Erard also fails to persuade that other laws somehow make the ballot-access requirements discriminatory. Like the Socialist Party, other minor parties are subject to the same financing and disclosure requirements. And like the Socialist Party, other minor parties must annually requalify for ballot access. In short, Michigan treats minor parties the same.

Moreover, as the magistrate observed, the complaint lacks allegations showing that the campaign-finance regulations have disproportionately affected the Socialist Party's operations. Report 62–63. There is, for instance, no allegation that, compared to other minor parties, a significantly greater portion of the Socialist Party's funding would come from corporate sources on which political parties can no longer rely.

C.    First Amendment Theory

While rejecting Erard's discrimination arguments, the magistrate writes that Michigan's ballot-access requirements and related regulation severely burden his First Amendment rights as applied to the Socialist Party, because the mandatory petition language hampers its signature collection and because Michigan severely restricts the pool of petition signers. The magistrate also concludes that the resulting burden is unconstitutional. The Secretary objects to the magistrate's characterization of both the severity and constitutionality of the burden. The Court agrees with the Secretary that the claim should be dismissed.

1.    Burden Imposed

The burden on Erard's rights is not severe. As the magistrate aptly observes, Supreme Court precedent shows that the number of signatures the Socialist Party must collect, the time limits on signature collection, and the limited monetary resources of the Socialist Party do not individually or collectively constitute a severe burden on Erard's First

18

Amendment rights. Report 35–44.  Because Erard has not filed "specific written objections" to the magistrate's conclusion, Fed. R. Civ. P. 72(b), the Court adopts that portion of the magistrate's analysis. The Court, however, differs regarding the magistrate's treatment of the mandatory petition language and circulator eligibility requirements.

a.   <u>Mandatory Petition Language</u>

Although the magistrate writes that the mandatory petition language is not facially unconstitutional — a conclusion to which neither Erard nor the Court objects — the magistrate believes that the petition language makes it difficult for the Socialist Party to gain ballot access. Report 47–48. The problem, she explains, is that potential signatories fear being publicly associated with the Socialist Party. *Id.* While that is a fair description of Erard's complaint, the magistrate errs by assuming that the petition language is the obstacle to obtaining signatures.

The reason registered voters refused to sign the Socialist Party's petition for ballot access is that they feared the ramifications of "publically documented (and formatively initiatory) association with socialist or politically radical organizing." Am. Compl. ¶ 99. For as the complaint explains, those who have publically associated with fringe political organizations have been subject to government surveillance and private harassment. Am. Compl. ¶¶ 99–110.

Apparently, this is why attendees at an Occupy Detroit demonstration were reluctant to sign a petition to place the Socialist Party on the ballot. As Erard recounts, they were reluctant to sign because they assumed "that *signing* the Socialist Party's petition (as requisitely worded) would pose a greater risk of *causing them to become adversely labeled in association* with politically radical involvement than would their own active and

19

self-initiated involvement" in the Occupy Detroit demonstration. Am. Compl. ¶ 99 n.122 (emphasis modified from original). Although the magistrate takes this passage as evidence that the petition language is faulty, a more faithful reading of the complaint is that people declined to sign the petition lest they risk harassment by publically documenting their association with the Socialist Party.

Strengthening this conclusion is the absence of any plausible explanation of how the petition language specially burdens the Socialist Party. In a response brief, Erard argues that registered voters will invariably view the petition language as requiring them to make a "permanent commitment" to the Socialist Party. Pl.'s Resp. to Objections 15. But as the magistrate explains, it is unlikely that reasonable persons will understand the petition language in that way — a conclusion to which Erard did not object. Report 43–46.

Because the reason for potential signatories' reluctance is that they must publicly document their sympathies with the Socialist Party, the mandatory petition language imposes no greater burden on the Socialist Party than other political parties. Erard's real argument is with the requirement that voters must sign the petition. But he identifies no authority intimating that a public signature requirement is a substantial burden.

### b.    Circulator Eligibility Requirements

Likewise, the burden created by the circulator eligibility requirements is much less onerous than either the magistrate or Erard supposes. Of course, the Court recognizes that state laws preventing non-residents from circulating petitions tends to burden First Amendment rights. *See Nader v. Blackwell*, 545 F.3d 459, 473–75 (6th Cir. 2008). But the passage of Public Act 94 alleviates the burden resulting from Michigan's prior requirement that those circulating petitions be registered Michigan voters. Since April 3, 2014, the

Socialist Party has been able to use both residents and non-residents for circulating petitions.

Erard replies, however, that this change comes too late to affect the outcome of his lawsuit. Although the change comes halfway through the last 180-day period for collecting signatures prior to the November 2014 election, the timing of the legislation still gave Erard 76 days to use non-resident volunteers to collect signatures ahead of the deadline for submitting a petition on June 17, 2014. The loss of 114 days is significant but not so significant as to create a severe burden on his constitutional rights considering that the Supreme Court has approved of legislation requiring parties to reach similar or higher qualification thresholds within much shorter circulation periods. *See Storer*, 415 U.S. at 740 (stating that by itself a law requiring parties to collect signatures equal to 5% of registered voters in 24 days would not create a severe burden); *Am. Party of Texas*, 415 U.S. 782–88 (approving of a 55-day period for circulating supplemental petitions designed to obtain signatures of 1% of registered voters). Moreover, the change comes in time to allow Erard to take advantage of warmer spring and summer weather, which he deems important to collecting signatures.

### 2.  State Justification

Because Michigan's revamped requirements do not individually or collectively severely burden Erard's constitutional rights as applied to him, strict scrutiny does not apply. Although a state must still have some rationale for making even reasonable, nondiscriminatory regulations, the state's interest in regulating elections will generally justify them. *Libertarian Party of Ohio*, 462 F.3d at 586 (citing *Burdick*, 504 U.S. at 434). Here, a number of important interests, like ensuring the integrity of elections, avoiding the clogging

21

of voting machinery, and preventing voter confusion, support the regulations Michigan has enacted. *See Timmons*, 520 U.S. at 364–65; *Am. Party of Texas*, 415 U.S. at 781–82 & n.14; *Jenness*, 403 U.S. at 442. Therefore, the Court will dismiss Erard's First Amendment claim.

IV.   Purity of Elections Clause

Erard also objects to the magistrate's recommendation to dismiss the claim that the ballot-access regulations violate the Michigan Purity of Elections Clause. The Court will overrule his objections.

The Michigan Constitution charges the legislature with enacting laws that "preserve the purity of elections." Mich. Const. of 1963 art. II, § 4. Although of broad dimensions, the Purity of Elections Clause at minimum requires "fairness and evenhandedness in the election laws" of the state. *Socialist Workers Party v. Secretary of State*, 412 Mich. 571, 598 (1982); *see also Wells v. Kent Cnty. Bd. of Election Comm'rs*, 382 Mich. 112, 123 (1969). Echoing his equal protection arguments, Erard argues that the Michigan's election laws violate the Purity of Elections Clause by requiring new parties to demonstrate twice the voter support as established parties. Pl.'s Objection 40–44..

As discussed above, it is far from apparent that Michigan law treats similarly situated parties differently. New and established political parties may qualify for the ballot in different ways, but just as different routes to the ballot are not necessarily discriminatory, they are not necessarily unfair. The Purity of Elections Clause permits — and may even require — Michigan to treat political candidates differently based on varying levels of voter support. *Jacobs v. Headlee*, 135 Mich. App. 167, 177 (1984) (upholding differential funding for candidates based on varying levels of voter support). This principle, in turn, suggests the

22

corollary that Michigan is not required to gauge voter support identically for candidates in different positions. Of course, some methods of calculating voter support may offend the Michigan Constitution. But giving due respect to the legislature, which is entrusted with the power to regulate the purity of elections, *see Gracey v. Grosse Pointe Farms Clerk*, 182 Mich. App. 193, 205 (1989), the Court cannot say that it is unfair for the Michigan legislature to qualify new and established parties differently given that the legislature could reasonably conclude that a vote in favor of a party reflects a greater showing of support than a signature on a petition.

V.    Derivative Claims

Finally, the Court will dismiss Erard's derivative claims because the federal and state claims on which they rest lack merit.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the Report (document no. 55) is **ADOPTED IN PART**.

**IT IS FURTHER ORDERED** that the Secretary's motion to dismiss (document no. 46) is **GRANTED** and that Erard's complaint is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: May 14, 2014


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 14, 2014, by electronic and/or ordinary mail.

23

s/Carol Cohron
Case Manager